# FOR PUBLICATION

ATTORNEYS FOR APPELLANT/
CROSS-APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE/
CROSS-APPELLANT:

**JOHN F. KAUTZMAN**
**ANDREW R. DUNCAN**
**EDWARD J. MERCHANT**
Ruckelshaus, Kautzman, Blackwell,
Bemis & Hasbrook
Indianapolis, Indiana

FILED

Sep 12 2012, 8:30 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellant/Cross-Appellee–Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1109-CR-459 |
| | ) | |
| DAVID BISARD, | ) | |
| | ) | |
| Appellee/Cross-Appellant–Defendant. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant W. Hawkins, Judge
Cause No. 49G05-1101-FB-2516

**September 12, 2012**

**OPINION - FOR PUBLICATION**

**SHEPARD, Senior Judge**

Officer David Bisard of the Indianapolis Metropolitan Police Department had his blood drawn by a medical assistant following an accident in which one person died and two people were seriously injured. The State later charged him with several counts of operating while intoxicated and reckless homicide.

Bisard moved to suppress the blood test on multiple grounds. He contended that the medical assistant on duty had not followed appropriate protocols, and that in any event the Indiana Code prohibits medical assistants from drawing blood for these purposes. Largely agreeing, the trial court ruled that Indiana Code section 9-30-6-6 (2010) compels suppressing the evidence for purposes of the DUI charges, but not for the reckless homicide count.

We conclude that the medical assistant did in fact draw the blood in a way that followed physician-approved protocols, and that the statutes cited by Bisard do not reflect that the General Assembly intended to suppress blood evidence taken in a medical facility by a trained operator in the presence of the suspect's lawyer. We therefore reverse.

FACTS AND PROCEDURAL HISTORY

In August 2010, Bisard was on duty in his patrol car when he collided with two motorcycles that were stopped at the intersection of 56th Street and Brendon Way South Drive. Eric Wells died, and Mary Mills and Kurt Weekly were seriously injured.

Bisard went to Methodist Occupational Health Center ("MOHC") for treatment of his injuries.[1] There, Officer Stan Stephens of the Lawrence Police Department advised him of Indiana's implied consent law, and Bisard consented to a blood draw. Appellant's Amended App. pp. 15, 50, 319-20.

Stephens asked medical assistant Michelle Maga to perform the blood draw and handed her two blood collection tubes. Tr. p. 88. Maga noticed that the tubes had expired, discovered that MOHC's available tubes had also expired, and called another clinic to have unexpired tubes sent over. *Id.* at 88-90, 55.

Stephens and other officers and Bisard's attorney were in the room during the draw. *Id.* at 56-57. Maga used a swab to clean an area on Bisard's right arm. *Id.* at 99, 119. She immediately realized that she had used an alcohol swab, which is not to be used when blood is drawn for alcohol screening. *Id.* at 56, 99, 130. She took off her gloves, washed her hands, gathered new equipment, and started the process over. *Id.* at 56, 99. She used Betadine, a non-alcohol swab, to clean an area on Bisard's left arm and drew two tubes of blood from that arm. *Id.* at 56, 57, 119, 52. She then inverted the tubes eight to ten times to mix in the additive in the tube to preserve the blood, applied a bandage, and discarded the needle. *Id.* at 53-54, 104-05.

Although MOHC's protocol required Maga to label the tubes, Ex. pp. 6, 10, 16, Stephens insisted on following police procedures. Tr. pp. 49, 61, 78. So, Stephens labeled the tubes as Maga watched, and she then initialed them as the collector. *Id.* at 88. MOHC also had a policy that the capped tubes be given a seal and placed in a drug screen

---

[1] MOHC is now Indiana University Health Occupational Services. It is not a hospital.

3

bag. Ex. p. 6; Tr. pp. 58-59. Although Maga tried to insist on using a seal, Stephens did not do so before placing the capped tubes in a sealed bag. Tr. pp. 58, 81, 88.

The blood results showed a blood alcohol content of 0.19. These test results are the only evidence of intoxication in the record.

The State, by then-Marion County Prosecutor Carl Brizzi, charged Bisard in multiple counts: class B felony operating a motor vehicle with a BAC of 0.15 or higher causing death, C felony operating a motor vehicle while intoxicated causing death, C felony reckless homicide, two counts of D felony operating a motor vehicle while intoxicated causing serious bodily injury, two counts of D felony operating a motor vehicle with a BAC of 0.08 or higher causing serious bodily injury, and two counts of D felony criminal recklessness. It later moved to dismiss the alcohol-related charges, which the court granted.

In January 2011, the State, under newly-elected Marion County Prosecutor Terry Curry, dismissed the remaining charges and immediately re-filed the reckless homicide and six operating while intoxicated charges under a new cause number.

Bisard moved to suppress the blood evidence and/or dismiss the charges, and the court held a hearing. On May 31, 2011, the court issued an order determining that Maga was not qualified to draw blood under the implied consent statutes and that there was no clear evidence that she followed any of MOHC's protocols for drawing blood. The court found that Maga did not place a seal on the tubes or package them for transport (the evidence being that Stephens packaged the tubes for transport in a police evidence bag). The court also found "significant conflict in the evidence" as to "whether the tubes were

4

properly handled in order to mix the anti-coagulant in the tubes with the blood" and "whether or not blood was drawn from an arm that had been swabbed with alcohol rather than a proper cleansing solution." Appellant's Amended App. p. 353. The court thus suppressed the blood evidence as to the Title 9 charges for DUI but allowed the evidence for the reckless homicide count. The same day, the State amended the information to add the two original counts of criminal recklessness, which were apparently inadvertently omitted during the earlier re-filing.

Upon requests by both parties, the court certified its order for interlocutory appeal, and this Court accepted jurisdiction.

## ISSUES

The State contends that the court erred by suppressing the blood evidence for the Title 9 charges.

On cross-appeal, Bisard contends that the court erred by allowing the blood evidence for the Title 35 charges and by rejecting his claim that his consent to take the chemical test was invalid because the offer to do so was illusory inasmuch as Maga was not qualified to perform the blood draw.

## DISCUSSION AND DECISION

If a driver appears intoxicated, the Fourth Amendment would surely permit an officer with a search warrant to obtain a sample of breath or bodily substance for purposes of a chemical test. Obtaining a warrant takes time, of course, and alcohol begins to dissipate soon after drinking ceases. By the time an officer prepares the appropriate documents, finds a magistrate, presents evidence of probable cause, receives

5

a warrant, and arranges for a test, the evidence of blood alcohol would typically be substantially dissipated.

States have adopted implied consent statutes as a means of obtaining such evidence more expeditiously. These statutes proceed on the legal notion that any person who operates a vehicle consents to submit to a chemical test upon lawful request by an officer. 1 Edward Louis Fiandach, *Handling Drunk Driving Cases* § 8:1 (2d ed. 1995); 1 Donald H. Nichols & Flem K. Whited III, *Drinking/Driving Litigation: Criminal and Civil* § 11:2 (2d ed. 2006). New York enacted the nation's first implied consent law in 1953, and by 1971, all the other states and the District of Columbia had done the same. Nichols & Whited, *supra*, § 11:2.

These statutes have been repeatedly upheld against various constitutional claims. *See, e.g.*, *Mackey v. Montrym*, 443 U.S. 1, 99 S. Ct. 2612, 61 L. Ed. 2d 321 (1979) (suspension of driver's license for refusing to submit to breath testing without pre-suspension hearing did not violate Fourteenth Amendment due process rights); *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (blood draw after accident did not violate Fourth Amendment protection from unreasonable search and seizure or Fifth Amendment privilege against self-incrimination); *Breithaupt v. Abram*, 352 U.S. 432, 77 S. Ct. 408, 1 L. Ed. 2d 448 (1957) (blood draw from driver unconscious in hospital after fatal accident did not violate Fourteenth Amendment due process rights).

6

# I. INDIANA'S IMPLIED CONSENT STATUTES

Indiana's implied consent statutes appear at Indiana Code chapters 9-30-6 and 9-30-7. Like the rest of the nation, the policy behind our implied consent statutes is to keep roadways safe by removing the threat posed by the presence of drunk drivers. *Ruge v. Kovach*, 467 N.E.2d 673, 681 (Ind. 1984). To that end, the statutes facilitate the collection of evidence of a driver's intoxication. As Justice Rucker observed for a unanimous Court, the statute is "designed as a tool to acquire evidence of blood alcohol content rather than as a device to exclude evidence." *Abney v. State*, 821 N.E.2d 375, 379 (Ind. 2005).

While there are two leading chapters in the Code on implied consent, they interact closely. Chapter 9-30-7 deals with implied consent in accidents involving serious injury or death, thus covering cases like the one before us. Chapter 7 first sets forth the basis for implied consent: "A person who operates a vehicle impliedly consents to submit to the portable breath test or chemical test under this chapter as a condition of operating a vehicle in Indiana." Ind. Code § 9-30-7-2 (2001). In turn, if an officer has reason to believe that a driver operated a vehicle that was involved in a fatal accident or an accident involving serious bodily injury, the officer must offer a portable breath test or chemical test to that person. Ind. Code § 9-30-7-3(a) (2001). Refusal to submit to a test is an infraction and results in suspension of driving privileges. Ind. Code § 9-30-7-5 (2006).[2]

---

[2] Section 9-30-7-5 provides:

(a) A person who refuses to submit to a portable breath test or chemical test offered under this chapter commits a Class C infraction. However, the person commits a Class A

Section 9-30-7-4 (1991) directs that certain operational requirements will apply to tests in cases involving death or serious injury:

(a) If a chemical test conducted under this chapter involves an analysis of breath, the test must comply with the requirements under IC 9-30-6-5.

(b) IC 9-30-6-6 applies if a physician or a person trained in obtaining bodily substance samples who is acting under the direction of or under a protocol prepared by a physician or who has been engaged to obtain bodily substance samples:

(1) obtains a blood, urine, or other bodily substance sample from a person at the request of a law enforcement officer who acts under this section; or

(2) performs a chemical test on blood, urine, or another bodily substance obtained from a person under this section.

This bifurcated reference is straightforward enough: Section 9-30-6-5 deals with breath samples, while Section 9-30-6-6 deals with bodily substance samples.

There is no breath sample at issue here, so subsection 9-30-7-4(b) governs, and Bisard's claims rest on applying two parts of Section 6, subsections (a) and (j).

Subsection 6(a) provides:

A physician or a person trained in obtaining bodily substance samples and acting under the direction of or under a protocol prepared by a physician, who:

---

infraction if the person has at least one (1) previous conviction for operating while intoxicated.

(b) In addition to any other penalty imposed, the court shall suspend the person's driving privileges:

(1) for one (1) year; or

(2) if the person has at least one (1) previous conviction for operating while intoxicated, for two (2) years.

(1) obtains a blood, urine, or other bodily substance sample from a person, regardless of whether the sample is taken for diagnostic purposes or at the request of a law enforcement officer under this section; or

(2) performs a chemical test on blood, urine, or other bodily substance obtained from a person;

shall deliver the sample or disclose the results of the test to a law enforcement officer who requests the sample or results as a part of a criminal investigation. Samples and test results shall be provided to a law enforcement officer even if the person has not consented to or otherwise authorized their release.

Bisard has argued that, contrary to subsection (a), Maga was not a physician or a person trained in obtaining bodily substances samples and acting under the direction of or under a protocol prepared by a physician.

The other provision Bisard argues is subsection (j), which, at the time of the blood draw here, said:

This subsection does not apply to a bodily substance sample taken at a licensed hospital (as defined in IC 16-18-2-179(a) and IC 16-18-2-179(b)). A law enforcement officer may transport the person to a place where the sample may be obtained by any of the following persons who are trained in obtaining bodily substance samples and who have been engaged to obtain samples under this section:

(1) A physician holding an unlimited license to practice medicine or osteopathy.

(2) A registered nurse.

(3) A licensed practical nurse.

(4) An emergency medical technician-basic advanced (as defined in IC 16-18-2-112.5).

(5) An emergency medical technician-intermediate (as defined in IC 16-18-2-112.7).

9

(6) A paramedic (as defined in IC 16-18-2-266).

Bisard's argument on subsection 6(j) is that the Code requires suppression because Maga does not qualify as one of the actors on this list.

## II. PRIOR DECISIONS

Most of the decisions of this Court in cases seeking reversal due to contentions about the implied consent statutes have led us to conclude that the tests were properly admitted.[3]

Bisard's two strongest cases point in the opposite direction. In *Combs v. State*, 895 N.E.2d 1252 (Ind. Ct. App. 2008), *trans. denied*, the defendant challenged the admission of blood test results by claiming that the State failed to show that the medical technologist who drew his blood was acting under a protocol prepared by a physician pursuant to subsection 6(a). The State had not presented *any evidence at all* that the technologist was acting under a protocol prepared by a physician. This Court concluded it was an abuse of discretion to admit the test but affirmed the conviction on the basis of

---

[3] See, for example, *Kolish v. State*, 949 N.E.2d 856, 860 (Ind. Ct. App. 2011), *trans. denied*, in which we affirmed a conviction where the blood draw was performed at a licensed hospital and according to protocol, and *Boston v. State*, 947 N.E.2d 436, 444 (Ind. Ct. App. 2011), in which we affirmed the denial of a motion to suppress where the blood draw was performed at a licensed hospital.

The facts in each of these cases indicate that the blood drawn was not the only evidence of intoxication. *See Kolish*, 949 N.E.2d at 857 (defendant crossed center line and nearly collided with oncoming vehicles, smelled of alcohol, had red and watery eyes and slurred speech, had two coolers and empty beer cans in back of truck, admitted consuming alcohol, was unable to complete field sobriety tests); *Boston*, 947 N.E.2d at 438-39 & n.1 (no probable cause affidavit in record on appeal, but defendant requested blood alcohol test after being arrested on suspicion of operating while intoxicated).

harmless error because there was ample independent evidence of the defendant's intoxication.[4] *Id.* at 1259.

In *Brown v. State*, 911 N.E.2d 668 (Ind. Ct. App. 2009), *clarified on reh'g*, 915 N.E.2d 996 (2009), *trans. granted*, *order vacated*, *trans. denied*, the defendant argued that the blood draw, performed at a hospital by a certified medical lab technician who was trained to draw blood, did not comply with subsection (j). Relying partly on *Combs*, this Court held that the test results must be suppressed because the technician, though trained in drawing blood, was not among the personnel in the list of subsection (j), which at the time included certified phlebotomists.[5] Because there was substantial independent evidence of intoxication, however, the Court affirmed on the basis of harmless error.[6] *Id.* at 673-74.

The reaction to this holding was swift and telling. In December 2009 the Supreme Court granted transfer in *Brown*, in March 2010 the legislature amended subsection 6(j) by eliminating certified phlebotomists and adding that the subsection does not apply at all

---

[4] To similar effect was *State v. Hunter*, 898 N.E.2d 455 (Ind. Ct. App. 2008), in which the court suppressed the results of a blood test where the State did not offer evidence that the hospital nurse who drew the blood was acting under a protocol prepared by a physician.

[5] The technician was certified to practice phlebotomy, but she was not a certified phlebotomist. *Brown*, 911 N.E.2d at 673 n.2.

[6] The defendant had glassy and bloodshot eyes and slurred speech, smelled of alcohol, was unsteady when exiting his truck, admitted consuming several beers, defecated in his pants, failed one field sobriety test, and was unable to complete another. *Brown*, 911 N.E.2d at 671.

to bodily substance samples taken at licensed hospitals, and in May 2010 the Supreme Court vacated its order granting transfer.[7]

These two cases may fairly be described as one in which suppression was proper because the State failed completely in offering a foundation for admissibility and another in which the General Assembly immediately overruled the holding. They are relatively weak precedent as support for Bisard's position.

### III. THE OPERATION OF SECTION 9-30-6-6 AND ADMISSIBILITY

The best evidence of legislative intent is surely the language of the statute itself, and courts strive to give the words in a statute their plain and ordinary meaning. *Prewitt v. State*, 878 N.E.2d 184, 186 (Ind. 2007). A statute should be examined as a whole, avoiding excessive reliance upon a strict literal meaning or the selective reading of individual words. *Id.* We presume that the legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Id.*

To examine the legislative framework, we begin with its evident purpose. The Code's plain language authorizes admitting blood alcohol concentration evidence in DUI prosecutions if the sample was obtained promptly enough after the incident:

> At any proceeding concerning an offense under IC 9-30-5 or a violation under IC 9-30-15, evidence of the alcohol concentration that was in the blood of the person charged with the offense:
>
> > (1) at the time of the alleged violation; or

---

[7] See the subsequent history of *Brown*, which shows that transfer was granted, the order was vacated, and transfer was denied, and *Boston v. State*, 947 N.E.2d 436, 442 (Ind. Ct. App. 2011), which summarizes the actions of the legislature and the Supreme Court after this Court's opinion in *Brown*.

(2) within the time allowed for testing under section 2 of this chapter;

as shown by an analysis of the person's breath, blood, urine, or other bodily substance is admissible.

Ind. Code § 9-30-6-15(a) (2001).[8] The statute by its own terms confirms the generally understood purpose of implied consent laws.

On the admissibility of test results, the Code reflects starkly different legislative policies as between breath tests and blood tests. Subsection (d) of 9-30-6-5 (governing breath samples), explicitly declares that "[r]esults of chemical tests that involve an analysis of a person's breath are not admissible" if certain requirements are not met. By contrast, the section governing bodily substance samples demonstrates a broader approach: "For the purposes of this chapter, IC 9-30-5, or IC 9-30-9[,] . . . samples, test results, and testimony may be admitted in a proceeding in accordance with the applicable rules of evidence." Ind. Code § 9-30-6-6(c). That the General Assembly has explicitly barred evidence in breath tests where certain processes are not followed but not done so in blood tests is an important sign of its intent about how courts should examine the admissibility of blood tests.

A legislative policy that differentiates between the two types of tests seems altogether logical. Blood samples are obtained and analyzed by medical professionals who are trained to produce reliable results. Breath samples, on the other hand, are taken

---

[8] We have recently rejected a defendant's claim that such evidence is inadmissible in prosecutions of chapter 9-30-5 offenses if the sample was obtained under chapter 9-30-7. *See Temperly v. State*, 933 N.E.2d 558, 566 (Ind. Ct. App. 2010), *trans. denied*, *cert. denied*, 132 S. Ct. 496, 181 L. Ed. 2d 345 (2011).

under field conditions by law enforcement officers who are trained in the best practices necessary to conduct the test, but not so expert in the underlying analytical chemistry. In those settings, we rely substantially on the results provided by a scientific instrument. Adherence to rules pertaining to breath test operators, equipment, and chemicals as well as the proper technique for administering a breath test are thus paramount to ensuring a reliable result.

The Supreme Court has recognized that this sort of difference characterizes the larger legislative scheme concerning admissibility of tests. After reviewing the range of statutes covering everything from radar speed results to breath tests to DNA analysis, the Court observed that "the more technical the test involved, the less particularized as a matter of law are the foundational requirements." *Hopkins v. State*, 579 N.E.2d 1297, 1303 (Ind. 1991). Put another way, "the greater the level of expertise involved, the more that procedural particulars are left to the expert's discretion." *Id.*

If anything, the Supreme Court's declaration in *Hopkins* has been confirmed by the subsequent adoption of the Indiana Rules of Evidence and by the fact that chapters 9-30-6 and 9-30-7 (by referring back to chapter 9-30-6), indicate that blood evidence is generally admissible subject to rules of evidence. The spirit of the Indiana Rules of Evidence is to allow any relevant evidence. *See* Ind. Evidence Rule 402 (all relevant evidence is admissible except as otherwise provided by law). This is tempered by Rule 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

14

misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." We see none of the Rule 403 factors here.

In sum, the implied consent statutes must be read with their global purpose in mind, namely to facilitate collecting evidence of impaired driving. Where the Code commands exclusion for failure to comply with one of its dictates, exclusion it shall be. Where the Code does not direct exclusion, the court must decide admissibility with reference to the Code and the Rules of Evidence.

## IV. DID THE MEDICAL ASSISTANT FOLLOW PROTOCOL?

Subsection 9-30-6-6(a) applies only to "[a] physician or a person trained in obtaining bodily substance samples and acting under the direction of or under a protocol prepared by a physician." Bisard argues that although Maga is trained in obtaining bodily substance samples, she was not acting under the direction of or under a protocol prepared by a physician.

Bisard loses on this point because the evidence shows that Maga's taking of his blood conformed to a protocol prepared by a physician.

At the suppression hearing, the State offered into evidence three different MOHC blood draw protocols. Two of these are fairly detailed and nearly identical. Exhibit 2 was a protocol approved in 2005 by Medical Director Michael Patellos, a doctor, and Exhibit 3 was a protocol approved in 2008 by Director of Practice Operations Shawn Dent, a registered nurse. Exhibits 2 and 3 each provided 24-step instructions on how to prep and obtain blood. They were identical except that the order of inverting the tubes to

15

mix the blood and additives, applying the bandage, and discarding the needle were different.

Exhibit 1 was a much shorter protocol specifically for blood alcohol draws approved in 2008 by Dent. Exhibit 1 did not specify how to obtain blood but instead instructed in one step to "[o]btain the requested blood specimen using Povidine swab for skin prep." Ex. p. 6. Many of the steps in Exhibit 1 describe how to go about evidence handling.

Dr. Saj Alex, a physician at MOHC, testified during the suppression hearing that Exhibits 1 and 3 were medically appropriate.

The trial court's grant of Bisard's motion to suppress rested on several grounds about following protocol. The court found that Maga "was not given an opportunity to perform two functions she felt her procedure required: place a seal on the tubes into which the blood had been drawn and package the tubes for transport." Appellant's Amended App. pp. 352-53. Maga and a radiology technician tried to insist that Stephens use the seal, but he declined and placed the tubes in a sealed bag.

In any event, the steps to which the trial court's order referred were not a part of the protocol signed by Dr. Patellos and reissued by nurse Dent. These steps appear in Exhibit 1, the document issued by Dent, which told those who draw blood for alcohol cases, contemplating criminal prosecution, to prepare the label by placing "the peel off specimen seal from the Custody and Control Form over the top and down sides of collection tube" and place "sealed blood in appropriate biohazard container for transport." Ex. p. 6.

16

That Maga did not perform steps that are not part of the protocol approved by a physician is not a ground on which one can argue that a specimen should be suppressed because it was not taken in accordance with a protocol approved by a physician.

A second protocol-related ground on which the trial court granted Bisard's motion is reflected in the court's finding of a "significant conflict in the evidence regarding whether the tubes were properly handled in order to mix the anti-coagulant in the tubes with the blood." Appellant's Amended App. p. 353. This may refer to whether Maga first inverted the tubes to mix them then discarded the needle or did it the other way around. There is no contention on appeal that this mattered in any real-world sense, much less any medical evidence so suggesting. Indeed, the only medical evidence in the record is from a physician who testified that it did not.

Or, it may refer to whether Maga "gently invert[ed] eight to ten times to mix blood thoroughly with additive," to use the words of Dr. Patellos's protocol. Ex. p. 12 (emphasis omitted). Maga testified during the suppression hearing that she inverted the tubes eight to ten times. Although Bisard elicited evidence that her written summary of the draw did not mention that she inverted the tubes, this is not conflicting evidence. That is, it does not mean she did not in fact invert the tubes. Neither is it conflicting evidence that Maga said in a police interview that she did not remember whether she inverted the tubes and then said, after some thought, that she was positive that she did.

Finally, the trial court found no clear evidence on "whether or not blood was drawn from an arm that had been swabbed with alcohol rather than a proper cleansing solution." Appellant's Amended App. p. 353. On this point, Maga testified that she

17

swabbed Bisard's right arm with alcohol, realized the mistake, and started the process anew with his left arm. She testified that she cleaned the left arm with Betadine and drew two tubes of blood from that arm. In the probable cause affidavit, however, an Officer Douglas Heustis stated, "Lt. Stephens then observed medical assistant Michelle Maga use a Betadine prep to clean the inner right arm of David Bisard. Michelle Maga then drew two tubes of blood from David Bisard's right arm." *Id.* at 16, 50. The affidavit does not indicate that Officer Heustis personally observed the blood draw.

As for the affidavit, we have the same cold evidence before us as did the trial court. We are thus able to assess independently this evidence without invading the province of the trial court. *See Bunch v. State*, 964 N.E.2d 274, 293 (Ind. Ct. App. 2012) (not deferring to post-conviction court's assessment of expert's scientific evidence where that assessment was based not on demeanor but on evidence that was also before appellate court), *trans. denied*. As against Maga's live testimony, a probable cause affidavit signed by someone who was not present holds little to no weight on this point. The great weight of the evidence is that Maga cleaned Bisard's left arm with Betadine and drew blood from that arm.

## V. DOES SUBSECTION 9-30-6-6(J) COMPEL SUPPRESSION?

Bisard has argued, and the trial court agreed, that the Code requires suppressing blood test results unless the person who draws the blood is one of the actors enumerated in subsection 9-30-6-6(j), such as physicians, registered nurses, paramedics, and the like. The parties agree that medical assistant Maga is not one of those.

18

As with earlier issues, the analysis necessarily begins with the part of the Code governing accidents resulting in death or serious bodily injury, chapter 9-30-7. Subsection 4(b) of that chapter tells us that Section 9-30-6-6 "applies" where one of three actors is at work drawing blood:

- "a physician";

- "a person trained in obtaining bodily substance samples who is acting under the direction of or under a protocol prepared by a physician"; or

- "a person trained in obtaining bodily substance samples . . . who has been engaged to obtain bodily substance samples."

It is plain that Maga was the second or third of these. What is not plain is how Section 9-30-7-4(b) and Section 9-30-6-6 can be tightly read together. Is Section 9-30-6-6 designed to sanction blood draws from persons in the six categories of (j) whether or not they use a protocol approved by a physician? Why are physicians on the list in subsection 6(j) at all, inasmuch as physicians are already covered by earlier subsections in Section 6? And, as amended, should the courts conclude that any person "trained" and in a hospital may draw blood whether they are following a protocol or not?

As is often the case with statutes written at different times and with different problems in mind, trying to shoehorn these provisions seems likely to produce results that the General Assembly never contemplated and did not intend. The one thing we can say for certain is that the Code does not direct that samples taken under these various alternatives be automatically suppressed, as it does for breath samples. We conclude that the legislature's specific reference to applying the rules of evidence and the implied consent statutes' global purpose, as the Supreme Court has said, to "acquire evidence of

19

blood alcohol content rather than . . . to exclude evidence," *Abney*, 821 N.E.2d at 379, means that, standing alone, the fact that the drawer is not on the list in subsection (j) does not compel suppression.

This is not to say that anyone may draw blood or that it may be drawn in any manner. Rather, subsection (j) tells us that blood may be drawn at a licensed hospital or by certain people if not at a licensed hospital. To the extent that someone else draws blood, the evidence must show that the person is properly trained and performed the draw in a medically acceptable manner. Here, Maga had been trained to obtain bodily substance samples and performed blood draws every day in her position as a medical assistant. As discussed above, we conclude that the procedure she followed complied with the available protocols for drawing blood.

We thus hold that the trial court erred by suppressing the evidence on the basis of subsections (a) or (j).

## VI. ISSUES ON CROSS-APPEAL

Bisard claims that the trial court erred in allowing the blood test evidence for purposes of the Title 35 offenses while excluding that evidence for purposes of the Title 9 offenses. Because we conclude that the evidence meets the requirements specified under Title 9, the Rules of Evidence, which govern the admissibility of evidence for Title 35 offenses, clearly support admissibility.

Bisard also claims the consent he gave could not be valid because it was given pursuant to an illusory offer, i.e., an offer of a blood draw to be performed by a person not authorized to draw blood according to Title 9. Because we conclude that the

20

provisions of Title 9 do not compel exclusion, we think this particular issue on cross-appeal is moot.

CONCLUSION

The implied consent statutes indicate that blood evidence is admissible so long as it complies with the rules of evidence. Although Maga was not a person enumerated in subsection (j), she was trained in obtaining bodily substance samples and generally followed MOHC protocol when she drew Bisard's blood. Bisard makes no credible suggestion that any deviation compromised the reliability of the samples. We therefore reverse the trial court's suppression of the blood evidence and remand for further proceedings.

Reversed and remanded.

ROBB, C.J., and BRADFORD, J., concur.