

FILED

Mar 23 2016, 7:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael J. Kyle
Kathie A. Perry
Baldwin Kyle & Kamish
Franklin, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Morgan Mannix,<br><br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br><br>*Appellee-Plaintiff* | March 23, 2016<br><br>Court of Appeals Case No.<br>49A04-1505-CR-294<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Kurt M. Eisgruber<br><br>Trial Court Cause No.<br>49G01-1211-FC-79738 |

**Vaidik, Chief Judge.**

# Case Summary

Morgan Mannix struck and killed Alex Trabbert, who was walking along the road, when she was driving home around 2:30 a.m. Mannix stopped her car and briefly looked around but then left when she did not see anything. Mannix later consented to a blood draw, which occurred approximately seven and a half hours after the accident. The results showed that Mannix's blood-alcohol concentration was 0.10.

After a jury trial, Mannix was convicted of Class C felony failure to stop after an accident resulting in death and Class C felony operating while intoxicated causing death. Despite noting that he had never seen more compelling mitigators than in this case, the trial judge sentenced Mannix to an above-advisory term of six years for each conviction, to be served concurrently. The judge suspended two years and ordered one year of probation.

Reading together Indiana Code sections 9-30-6-15 and 9-30-7-3, we conclude that the fact that a chemical test was administered more than three hours after an accident does not render it inadmissible; rather, it deprives the State of the rebuttable presumption that the driver's blood-alcohol concentration at the time of the test was the same at the time of the accident. In addition, we agree that the trial court erred in sentencing Mannix to an above-advisory term for each conviction. This is because the judge appeared to rely on the elements of one offense to support an above-advisory sentence for the other offense, and vice versa, but did not identify anything unique about the circumstances that would

justify deviating from the advisory sentence, especially in light of the numerous mitigators in this case. We therefore use our review-and-revise authority to sentence Mannix to the advisory term of four years with one year suspended for each conviction, to be served concurrently, and one year of probation.

# Facts and Procedural History

[4] In November 2012, twenty-three-year-old Morgan Mannix went home for Thanksgiving. She stayed with her parents, who lived on the northeast side of Indianapolis.

[5] The day after Thanksgiving, Mannix drove to a friend's house at 96th Street and Allisonville Road. According to Mannix, she drank "probably" six Bud Light beers between 11 p.m. and 1 a.m. Ex. 14. She stopped drinking around 1:00 a.m. and then left her friend's house around 2:30 a.m. to drive back home.

[6] Mannix took Shadeland Avenue to get home. She was driving south on Shadeland between 71st and 75th Streets when her passenger-side tires left the road and drove on the adjacent grass for over 100 feet.[1] Mannix struck and killed twenty-three-year-old Alex Trabbert with her car. Alex had just left Fairbanks, an addictions treatment center near Community Hospital North at 82nd Street and Shadeland, and was walking along Shadeland carrying a pillow

---

[1] At trial, an officer explained that there was no emergency lane or gravel area between the road and the grass. In other words, the road "basically goes from white line to grass." Tr. p. 237-38.

and trash bag full of his belongings. Mannix did not know what she hit and stopped her car. She looked around for about 10-15 seconds but then left when she did not see anything. Mannix drove the rest of the way home and went straight to bed. She did not call 911.

[7] Around 5:30 a.m. Saturday morning, a passerby was driving south on Shadeland and spotted Alex's body by the side of the road. The passerby called 911, and police officers arrived on the scene shortly thereafter. Alex had massive head trauma and bleeding. His cause of death was later determined to be multiple blunt force trauma to the head. Tr. p. 383.

[8] When Mannix woke up Saturday morning around 8:30 a.m., she told her father, Charles Mannix, that she "was driving home last night and something hit [her] car." *Id.* at 265. Charles surveyed the damage to his daughter's car, which included a shattered windshield on the passenger side and a dented hood. Charles then drove approximately two miles to the location Mannix described, where he encountered Indianapolis Metropolitan Police Department Detective Eric Snow—a member of Marion County's Fatal Alcohol Crash Team—sweeping debris. Charles asked Detective Snow if there had been an accident, and Detective Snow said that a pedestrian had been struck and killed. Charles responded, "I think my daughter may have been involved." *Id.* at 271. Detective Snow asked if he could come to their house to see Mannix's car, and Charles agreed.

[9] Detective Snow and Lawrence Police Department Officer Michael McKenna—also a member of the Fatal Alcohol Crash Team—went to the Mannix home. Detective Snow arrived first; he examined Mannix's car and then went inside to speak with Mannix and her parents. When Officer McKenna arrived, he used a card to read Mannix Indiana's implied-consent law for crashes involving fatalities. *Id.* at 295-96. Officer McKenna specifically told Mannix that she had the right to refuse the chemical test as well as the penalties for refusing. *Id.* at 295. Mannix consented to a blood draw, and Officer McKenna drove her to Eskenazi Hospital.[2] During their interactions with Mannix, both officers smelled alcohol on her breath and person. *Id.* at 300, 467.

[10] At the hospital, Mannix told the registered nurse that she consented to the blood draw and then signed the hospital's toxicology-sample log, which indicated that her blood draw was by "consent." *Id.* at 340-41; Ex. 17. Mannix's blood was drawn at 9:52 a.m., approximately seven and a half hours after the accident. Tr. p. 543; Ex. 17. Testing showed that Mannix's blood-alcohol concentration was 0.10. Ex. 23. Using retrograde extrapolation, Mannix's blood-alcohol concentration was estimated to be between 0.17 and 0.28 at the time of the accident. Testing also showed the presence of marijuana.

[11] After the blood draw, Mannix agreed to give a statement. She was transported to the police station, where she waived her *Miranda* rights and gave her version

---

[2] It was called Wishard Hospital at the time.

of the events. She explained that after she struck Alex with her car, she "freaked out" and "panicked" because she thought she might have hit a person. Ex. 14. She stopped her car and briefly looked around but then left "too soon." *Id.* She acknowledged that she "shouldn't have left" and that she should have called 911. She told the police that she wanted to do "absolutely whatever" she could to "take responsibility." *Id.* She broke down when the officers told her that Alex was her age.

[12] Three days after the accident, the State charged Mannix with one count: Class C felony failure to stop after an accident resulting in death. The State later added Class B felony operating a vehicle with a controlled substance or its metabolite in the body causing death. Then, on July 17, 2014—which was a few days before trial was set to begin and when plea negotiations had stalled—the State moved to amend the charging information to include three additional counts, all involving alcohol: Class B felony operating a vehicle with a blood-alcohol concentration greater than 0.15 causing death, Class C felony operating a vehicle with a blood-alcohol concentration greater than 0.08 causing death, and Class C felony operating a vehicle while intoxicated causing death. The trial court took the trial off the calendar and charged the delay to the State. On November 24, 2014, the trial court issued an order allowing the State to add the Class C felony OWI-causing-death charge—but not the BAC charges[3]—and

---

[3] The trial court reasoned that the extrapolation evidence could not reliably establish a specific BAC at the time of the accident. However, the court noted that the OWI-causing-death charge was different,

rescheduled the trial. *See* Appellant's App. p. 195-98 (trial court's order); 12-13 (final charging information listing three charges).

[13] Mannix's jury trial began April 6, 2015. The jury found Mannix guilty of Class C felony failure to stop after an accident resulting in death and Class C felony operating a vehicle while intoxicated causing death but not guilty of Class B felony operating a vehicle with a controlled substance in the body causing death.

[14] Mannix faced a sentence of "between two (2) and eight (8) years, with the advisory sentence being four (4) years" for each Class C felony conviction. Ind. Code § 35-50-2-6(a). In addition, both of Mannix's sentences were fully suspendable at that time. *See* Ind. Code Ann. § 35-50-2-2 (West 2012); Tr. p. 743, 752 (prosecutor and defense counsel pointing out to the trial court that Mannix's sentences were suspendable). At the sentencing hearing, Mannix, who was twenty-six years old, submitted several letters, called five witnesses, and testified on her own behalf. Defense counsel argued that Mannix had no criminal history, had excelled in her career, and had a rare family structure and unit. He also highlighted that Mannix "surrendered to the authorities and was cooperative with them," had engaged in counseling and drug and alcohol treatment while on bond awaiting trial, and was clearly remorseful. *Id.* at 752.

---

because it required "a showing of intoxication rather than the precision required of BAC calculations." Appellant's App. p. 198.

Defense counsel, who claimed that there were no aggravators, did not ask for a fully suspended sentence for Mannix. Instead, he asked that Mannix not be sent to the Indiana Department of Correction but rather serve any time through Marion County Community Corrections.

[15] In pronouncing sentence, the trial judge noted that this case involved "a series of poor decision making that resulted in a tragedy." *Id.* at 757. The judge explained that his "philosophy" for these cases is that the "presumption" is that the defendant goes to prison when someone dies. *Id.* The judge acknowledged that Mannix was "a good person" and "a highly respected individual in our community" and in her profession. *Id.* at 754, 757. In fact, the judge said that "in [his] career," he had never seen more "compelling" mitigators than in this case. *Id.* at 757. Nevertheless, the judge sentenced Mannix to an above-advisory term of six years for each conviction, to be served concurrently. The judge suspended two years and ordered the final year of the executed portion of the sentence to be served on home detention. *See id.* at 758 ("Three years at the Department of Correction[] followed by one year of Community Corrections."). The judge also ordered Mannix to serve one year of probation.

[16] Mannix now appeals.

# Discussion and Decision

[17] Mannix raises three issues on appeal. First, she contends that the trial court erred in admitting evidence of her blood draw because her consent was not

voluntary. Second, she contends that the trial court erred in allowing the State to amend the charging information to add Class C felony OWI causing death because it was a substantive amendment that prejudiced her substantial rights. Last, she contends that the trial court erred by relying on the elements of the offenses to sentence her to an above-advisory term for each conviction.

# I. Consent for Blood Draw

[18] Mannix contends that the trial court erroneously admitted evidence of her blood draw in violation of the Fourth Amendment to the United States Constitution. Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Halsema v. State*, 823 N.E.2d 668, 676 (Ind. 2005). In cases involving a warrantless search, the State bears the burden of proving an exception to the warrant requirement. *Id.* One of the well-recognized exceptions to the warrant requirement is a voluntary and knowing consent to search. *Temperly v. State*, 933 N.E.2d 558, 563 (Ind. Ct. App. 2010), *trans. denied*. The voluntariness of a consent to search is a question of fact to be determined from the totality of the circumstances. *Id.* A consent to search is valid except where it is procured by fraud, duress, fear, or intimidation, or where it is merely a submission to the supremacy of the law. *Id.*

[19] At trial, the State relied on Indiana's implied-consent law as authority for the warrantless search of Mannix's blood. Our implied-consent law provides that a "person who operates a vehicle impliedly consents to submit" to the test provisions "as a condition of operating a vehicle in Indiana." Ind. Code §§ 9-

30-6-1, 9-30-7-2. The policy behind this law is to keep roadways safe by removing the threat posed by the presence of drunk drivers. *State v. Bisard*, 973 N.E.2d 1229, 1232 (Ind. Ct. App. 2012), *trans. denied*.

[20] Indiana's implied-consent law appears at Indiana Code chapters 9-30-6 and 9-30-7. Indiana Code chapter 9-30-7 applies here because there was a fatality. Under this chapter, if a police officer "has reason to believe" that a person operated "a vehicle that was involved in a fatal accident or an accident involving serious bodily injury," the officer "shall offer a portable breath test *or* chemical test" to that person. Ind. Code § 9-30-7-3(a) (emphasis added). Unlike Chapter 9-30-6,[4] the officer is not required to have probable cause that the driver was intoxicated. *Temperly*, 933 N.E.2d at 562; *Brown v. State*, 744 N.E.2d 989, 993 (Ind. Ct. App. 2001). Refusal to submit to a portable breath test or chemical test is an infraction and results in the suspension of driving privileges. Ind. Code § 9-30-7-5.

[21] Mannix, who concedes that the officers had reason to believe that she was involved in the fatality, *see* Appellant's Br. p. 10, first argues that her consent was not voluntary because the officers did not offer her a portable breath test first. In support of this argument, Mannix relies on the following emphasized language in Indiana Code section 9-30-7-3(a):

---

[4] Chapter 9-30-6 requires a police officer to have probable cause that a person was intoxicated before offering a chemical test.

(a) A law enforcement officer shall offer a portable breath test or chemical test to any person who the officer has reason to believe operated a vehicle that was involved in a fatal accident or an accident involving serious bodily injury. *If:*

> *(1) the results of a portable breath test indicate the presence of alcohol;*
>
> *(2) the results of a portable breath test do not indicate the presence of alcohol but the law enforcement officer has probable cause to believe the person is under the influence of a controlled substance or another drug; or*
>
> *(3) the person refuses to submit to a portable breath test;*
>
> *the law enforcement officer shall offer a chemical test to the person.*

Ind. Code § 9-30-7-3(a) (emphasis added). Mannix claims that the emphasized language requires an officer to offer a portable breath test before offering a chemical test. However, the first sentence of subsection (a) states that an officer "shall offer a portable breath test *or* chemical test." *Id.* (emphasis added). Therefore, according to the plain language of the statute, when there is an accident resulting in serious bodily injury or death, the officer can choose what test to offer the driver first: (1) a portable breath test, the results of which are generally inadmissible at trial, *State v. Whitney*, 889 N.E.2d 823, 828 (Ind. Ct. App. 2008), or (2) a chemical test, the results of which are admissible at trial if certain requirements are met, *see Bisard*, 973 N.E.2d at 1233. The language that follows the first sentence simply sets forth additional conditions that apply if the officer chooses to offer the driver a portable breath test first. But because

Officer McKenna offered Mannix a chemical test first, these conditions do not apply here. We therefore do not address Mannix's arguments that the officers did not satisfy these conditions.

[22] Mannix next argues that her consent was not voluntary because the implied-consent law requires chemical tests to be administered within three hours of the accident, but her test was administered approximately seven and a half hours after the accident. The statute provides:

> (b) A law enforcement officer may offer a person more than one
> (1) portable breath test or chemical test under this section.
> *However, all chemical tests must be administered within three (3) hours after the fatal accident or the accident involving serious bodily injury.*

I.C. § 9-30-7-3(b) (emphasis added). There are no provisions in Chapter 9-30-7 that address what happens if the chemical test is not administered within three hours of the accident.

[23] We, however, have held that some provisions in Chapters 9-30-6 and 9-30-7 should be read together. *See Temperly*, 933 N.E.2d at 565. For example, we have specifically applied Indiana Code section 9-30-6-15, which addresses what happens if the chemical test is not administered within three hours, to Chapter 9-30-7. *See id.* Section 9-30-6-15 provides:

> (b) If, in a prosecution for an offense under IC 9-30-5, evidence establishes that:
>
> > (1) a chemical test was performed on a test sample taken from the person charged with the offense within the period

of time allowed for testing under section 2 of this chapter;[5] and

(2) the person charged with the offense had an alcohol concentration equivalent to at least eight-hundredths (0.08) gram of alcohol per:

> (A) one hundred (100) milliliters of the person's blood at the time the test sample was taken; or

> (B) two hundred ten (210) liters of the person's breath;

*the trier of fact shall presume that the person charged with the offense had an alcohol concentration equivalent to at least eight-hundredths (0.08) gram of alcohol per one hundred (100) milliliters of the person's blood or per two hundred ten (210) liters of the person's breath at the time the person operated the vehicle. However, this presumption is rebuttable.*

Ind. Code § 9-30-6-15(b) (emphasis added). This statute allows a jury to relate the driver's blood-alcohol concentration at the time of the chemical test back to the time of the accident. *Disbro v. State*, 791 N.E.2d 774, 778 (Ind. Ct. App. 2003), *trans. denied*; *Allman v. State*, 728 N.E.2d 230, 232 (Ind. Ct. App. 2000). If the State fails to prove that the chemical test occurred within three hours, it is not allowed to rely on the presumption. *Allman*, 728 N.E.2d at 232.

---

[5] According to Indiana Code section 9-30-6-2(c), "A test administered under this chapter must be administered within three (3) hours after the law enforcement officer had probable cause to believe the person committed an offense under IC 9-30-5 or a violation under IC 9-30-15."

[24] Mannix was charged with operating while intoxicated causing death under Indiana Code chapter 9-30-5. *See* Appellant's App. p. 12. Accordingly, Indiana Code section 9-30-6-15 applies. But because Mannix's blood was drawn more than three hours after the accident, the State was deprived of the rebuttable presumption in Section 9-30-6-15(b) and therefore must have provided extrapolation evidence relating Mannix's blood-alcohol concentration at the time of the test back to the time of the accident. *Allman*, 728 N.E.2d at 234; *State v. Stamm*, 616 N.E.2d 377, 380 (Ind. Ct. App. 1993). At trial, the State presented evidence that Mannix's blood-alcohol concentration was between 0.17 and 0.28 at the time of the accident. Accordingly, the fact that Mannix's blood was drawn more than three hours after the accident "is relevant only to the rebuttable presumption, not the admissibility of the chemical test." *See Stamm*, 616 N.E.2d at 380.

[25] The evidence shows that Mannix consented to a blood draw after Officer McKenna read her Indiana's implied-consent law, including that she had the right to refuse the chemical test as well as the penalties for refusing.[6] Mannix also told the registered nurse who drew her blood that she consented to the blood draw and then signed the hospital's log indicating that it was a

---

[6] Mannix filed a motion to suppress in which she claimed that Detective Snow essentially said that she was required to have her blood drawn. The trial court ruled that any error in Detective Snow's advisement was later cured when Officer McKenna properly advised Mannix of her rights under the implied-consent law. *See* Tr. p. 188-89, 195. Although Mannix appears to revive this argument on appeal, *see* Appellant's Br. p. 11, she provides no analysis and therefore has waived it.

consensual blood draw. Because Mannix voluntarily consented to the blood draw, the trial court did not err in admitting evidence of the blood draw.

# II. Amendment of Charging Information

[26] Mannix next contends that the trial court erred in allowing the State to amend the charging information to add Class C felony OWI causing death because it was a substantive amendment that prejudiced her substantial rights. The State concedes that the amendment was substantive but argues that the amendment did not prejudice Mannix's substantial rights. Appellee's Br. p. 33-34.

[27] Indiana Code section 35-34-1-5 governs amendments to charging informations. Subsection (b) provides, in pertinent part, that "[t]he indictment or information may be amended in matters of substance . . . at any time . . . before the commencement of trial . . . if the amendment does not prejudice the substantial rights of the defendant." Ind. Code § 35-34-1-5(b). A defendant's substantial rights "include a right to sufficient notice and an opportunity to be heard regarding the charge." *Erkins v. State*, 13 N.E.3d 400, 405 (Ind. 2014) (quotation omitted), *reh'g denied*. "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." *Id.* at 405-06 (quotation omitted).

[28] We agree with the State that Mannix's substantial rights were not prejudiced because she had more than sufficient time to prepare for and defend against the new charge. The State filed the motion to amend the charging information on

July 17, 2014, which the trial granted on November 24, 2014, and the jury trial began April 6, 2015. Mannix therefore had almost eight months from when the State filed the motion to amend—or almost five months from when the trial court granted the amendment—to prepare for and defend against the new charge. Because Mannix had a significant amount of time to prepare a defense, she cannot show that she was prejudiced by the added charge. *See Gomez v. State*, 907 N.E.2d 607, 611 (Ind. Ct. App. 2009) ("Here, the time period between the amendment of the charging information and the jury trial was approximately ten months and gave Gomez the opportunity to prepare for the murder charge. Gomez cannot show that he was prejudiced by the added charge as he had ample notice of the new charge and a significant amount of time to prepare a defense for the trial."), *trans. denied*. Accordingly, the trial court did not err when it granted the State's motion to amend the charging information to include Class C felony OWI causing death.

# III. Sentencing

[29] Mannix makes several challenges to her sentence, including that the trial court erred by relying on the elements of the offenses to sentence her to an above-advisory term for each conviction. *See* Appellant's Br. p. 14-15.

[30] The advisory sentence is the starting point our legislature has selected as an appropriate sentence for the crime committed. *Gomillia v. State*, 13 N.E.3d 846, 852 (Ind. 2014). Nevertheless, a trial judge may impose any sentence within the statutory range without regard to the existence of aggravating or mitigating

factors. *Id.* However, if the trial court finds the existence of aggravating or mitigating circumstances, then the court is required to give "a statement of the court's reasons for selecting the sentence that it imposes." *Id.* (quoting Ind. Code § 35-38-1-3); *see also Windhorst v. State*, 868 N.E.2d 504, 506 (Ind. 2007) ("Indiana trial courts are required to enter sentencing statements *whenever imposing sentence for a felony offense.*"), *reh'g denied*. The statement

> must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. If the recitation includes a finding of aggravating or mitigating circumstances, then the statement must identify all significant mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating.

*Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

[31] In addition, "[w]here a trial court's reason for imposing a sentence greater than the advisory sentence includes material elements of the offense, absent something unique about the circumstances that would justify deviating from the advisory sentence, that reason is improper as a matter of law." *Gomillia*, 13 N.E.3d at 852-53.

[32] Here, the trial judge said that "in [his] career," he had never seen more "compelling" mitigators than in this case. Tr. p. 757. The judge then appeared to justify imposing an above-advisory sentence for each conviction by relying

on "both counts and the elements" as aggravators.[7]  *Id.* at 757-58.  We find this problematic for two reasons.  First, the sentencing statement did not include a reasonably detailed explanation of why both counts and the elements of the offenses were aggravating.  Second, the judge essentially relied on the elements of one offense to support an above-advisory sentence for the other offense, and vice versa.  In other words, the judge relied on (1) the fleeing element from Mannix's conviction for failure to stop after an accident resulting in death to support an above-advisory sentence for OWI causing death and (2) the intoxication element from Mannix's conviction for OWI causing death to support an above-advisory sentence for failure to stop after an accident resulting in death.  Because the judge relied on the elements, he was required to identify something unique about the circumstances that would justify deviating from the advisory sentence.  The judge's failure to do this was improper as a matter of law.

---

[7] Although the judge did not explain this point further, he did say that he agreed with the prosecutor's analysis that the two counts allowed for an "aggravated sentence." Tr. p. 757-58.  The prosecutor had argued earlier that "the operating while intoxicated causing death followed by leaving the scene" were aggravators that supported an "enhanced aggravated sentence." *Id.* at 743.

In the alternative, the prosecutor argued that the trial court could impose an advisory sentence for each conviction and then run the sentences consecutively. *Id.* at 743-44.  But the prosecutor concluded that he did not think consecutive sentences were allowed because the elements (which were used as an aggravator) were "both absorbed in the crimes themselves." *Id.*  Notably, a trial court must find at least one aggravating factor before imposing consecutive sentences. *See Harris v. State*, 964 N.E.2d 920, 926 (Ind. Ct. App. 2012), *trans. denied*.  However, neither the State nor the trial court explained why it believed that the elements of the offenses could be relied on as an aggravator to justify above-advisory sentences but not used as an aggravator to justify consecutive sentences.  The State does not continue to make this argument on appeal.

[33] Where the trial court has erred in sentencing a defendant, there are several options for the appellate court. *Windhorst*, 868 N.E.2d at 507. "Without a trial court sentencing order that meets the requirements of the law," we have the option to remand to the trial court for a clarification or new sentencing determination. *Id.* Additionally, we may exercise our authority to review and revise the sentence. *Id.*

[34] We choose to exercise our authority to review and revise Mannix's sentence. Accordingly, we revise Mannix's sentence to the advisory term of four years with one year suspended for each conviction, to be served concurrently, and one year of probation.

[35] Affirmed in part and reversed in part.

Bailey, J., concurs.

Crone, J., concurs in part and dissents in part.

# IN THE
# COURT OF APPEALS OF INDIANA

Morgan Mannix,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 23, 2016

Court of Appeals Case No. 49A04-1505-CR-294

Appeal from the Marion Superior Court

The Honorable Kurt M. Eisgruber, Judge

Trial Court Cause No. 49G01-1211-FC-79738

**Crone, Judge, concurring in part and dissenting in part.**

I fully concur as to issues I and II. As to issue III, I respectfully dissent.

Here, as the majority notes, the trial court

> essentially relied on the elements of one offense to support an above-advisory sentence for the other offense, and vice versa. In other words, the judge relied on (1) the fleeing element from Mannix's conviction for failure to stop after an accident resulting in death to support an above-advisory sentence for OWI causing death and (2) the intoxication element from Mannix's conviction for OWI causing death to support an above-advisory sentence for failure to stop after an accident resulting in death.

Slip op. at 18. *Gomillia* does not prohibit this, nor does it require that a trial court find "something unique about the circumstances that would justify deviating from the advisory sentence" for an offense based on an element of

*another* offense. 13 N.E.2d at 852-53.[8] But even if the trial court had been required to do so in this case, I believe that the distinguishing elements of the offenses (fleeing, intoxication) are self-evident and therefore sufficient to support the trial court's sentence.

[38] On a more basic level, it is beyond dispute that committing multiple offenses is worse than committing one offense. Just as a person who harms multiple victims may deserve more punishment than a person who harms one victim,[9] a person who commits multiple offenses may deserve more punishment than a person who commits only one offense. I fail to see how the commission of two offenses cannot be considered an aggravating circumstance compared to the commission of one offense.

[39] Mannix asks us to reduce her sentence pursuant to Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. "The purpose of our review is not to reach what we perceive to be a 'correct' sentence but merely to 'leaven the outliers.'" *Gibson v. State*, 43 N.E.3d

---

[8] The *Gomillia* court's rationale for requiring a trial court to find "something unique about the circumstances that would justify deviating from the advisory sentence" for an offense based on an element of that offense is that "the Legislature has determined the appropriate advisory sentence based upon the elements of the offense." 13 N.E.3d at 852-53. That rationale does not (and in my view should not) apply to the enhancement of a sentence based on an element of a separate offense.

[9] *See Serino v. State*, 798 N.E.2d 852, 857 (Ind. 2003) ("[W]hen the perpetrator commits the same offense against two victims, enhanced and consecutive sentences seem necessary to vindicate the fact that there were separate harms and separate acts against more than one person.").

231, 241 (Ind. 2015) (quoting *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014)). "Because sentencing is a highly case-sensitive endeavor, we recognize it is generally a decision best made at the trial court level." *Id*. "[A]ppellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

[40] "When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended." *Weedman v. State*, 21 N.E.3d 873, 894 (Ind. Ct. App. 2014), *trans. denied* (2015). Here, the trial court suspended two years of Mannix's concurrent six-year terms and allowed her to spend one of the four remaining years on home detention rather than in the Department of Correction. "The question under Appellate Rule 7(B) is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate. It is the defendant's burden on appeal to persuade us that the sentence imposed by the trial court is inappropriate." *Hunt v. State*, 43 N.E.3d 588, 590 (Ind. Ct. App. 2015) (citation omitted), *trans. denied*.

[41] Mannix's "nature of the offense" argument is based solely on the trial court's reliance on the elements of one offense to support an enhanced sentence for the other offense. This is more properly characterized as a claim that the trial court abused its discretion in considering aggravating factors, which requires a separate analysis. *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008). I

would find no abuse of discretion for the reasons given above, and I would also find that Mannix has waived her inappropriateness argument as to the nature of her offenses.

[42] Waiver notwithstanding, I find such argument unpersuasive. Mannix drank at least six beers and got behind the wheel of her car in the middle of the night. She drove off the road for over 100 feet and struck Alex Trabert with enough force to knock him out of his shoes and into her windshield, which shattered. She made only a cursory effort to find whatever she hit, did not attempt to summon help, drove home, and went to bed. Later that morning, Trabert's dead body was found on the side of the road, and Mannix's blood tested positive for both alcohol and marijuana. The nature of Mannix's offenses supports a sentence above the advisory term and reflects unfavorably on her character. Although she has no criminal history and has achieved some educational and vocational success, she exhibited extremely poor judgment that resulted in the death of an innocent young man. She has used alcohol and marijuana since she was a teenager, and she continued to consume alcohol until the week of trial. Appellant's App. at 237 (presentence investigation report). Mannix has failed to persuade me that the trial court's sentence is inappropriate, and therefore I would affirm it.