

FILED

Apr 13 2020, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marc Lopez
The Marc Lopez Law Firm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney L. Staton
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Ruel P. Pedigo, III,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 13, 2020

Court of Appeals Case No.
19A-CR-1848

Appeal from the
Bartholomew Circuit Court

The Honorable
Kelly S. Benjamin, Judge

Trial Court Cause No.
03C01-1805-F4-2759

**Kirsch, Judge.**

[1] Ruel P. Pedigo, III ("Pedigo") was convicted of reckless homicide,[1] a Level 5 felony, causing death when operating a motor vehicle with a schedule I or II

---

[1] *See* Ind. Code § 35-42-1-5.

controlled substance in the blood[2] as a Level 4 felony, and causing serious bodily injury when operating a motor vehicle with a schedule I or II controlled substance in the body[3] as a Level 6 felony and was sentenced to an aggregate fifteen-year-sentence. Pedigo appeals his convictions and sentence and raises the following restated issues for our review:

I. Whether Indiana Code section 9-30-7-3 permits a law enforcement officer to offer a person more than one portable breath test or chemical test when the officer has reason to believe the person operated a vehicle that was involved in a fatal accident or an accident involving serious bodily injury;

II. Whether the trial court abused its discretion when it admitted Pedigo's chemical test results into evidence because he asserts that the results were not admissible under Indiana Code section 9-30-6-6; and

III. Whether Pedigo's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

On January 27, 2018, Patrick Bowman ("Bowman") and Sarah Fliehman ("Fliehman") were driving to the Columbus Bar to have dinner with their

---

[2] *See* Ind. Code § 9-30-5-5(c)(2).

[3] *See* Ind. Code § 9-30-5-4(a)(2).

friends. *Tr. Vol. III* at 338.[4] The couple was recently engaged and had just purchased a new cabin in Brown County. *Id*. at 337. On the way to dinner, they traveled eastbound on State Road 46 in Bartholomew County in their Mazda car and had to stop at a red light at the intersection of State Road 46 and Johnson Boulevard. *Id*. at 338. Shortly after their vehicle had come to a complete stop, Pedigo struck their Mazda from behind with his Ford F650 tow truck, which was loaded with another vehicle on its flatbed. *Tr. Vol. II* at 98-99, 151-52; *Tr. Vol. III* at 340.

[4] The collision created a chain reaction, which caused Bowman's car to collide with the other vehicles stopped at the red light. *Tr. Vol. III* at 261. When this chain reaction ended, the tow truck was positioned on top of the Mazda. *Tr. Vol. II* at 72, 207. Immediately after the accident, another individual involved in the accident called 911. *Id*. at 72. When law enforcement and paramedics arrived, they attended to the wreckage; Pedigo was still inside of the cab of his tow truck. *Id*. at 73, 82, 101, 163, 230.

[5] Upon his arrival, paramedic Michael Miles ("Miles") went to the driver's side of the Mazda to assess Bowman's injuries. *Id*. at 207. Bowman was unresponsive, and Miles observed that the Mazda had been crushed in around Bowman's body, pushing it against the steering wheel. *Id*. Based on the position of Bowman's body, it was difficult for Miles to provide care, but Miles

---

[4] We note that Volume III of the transcript is not separately paginated, but is instead, consecutively paginated from the end of Volume II.

was able to reach into the vehicle to check Bowman for a pulse and place an electrocardiogram ("EKG") on him, which registered that Bowman's heart was pulseless but that it may have had electrical activity. *Id.* at 207-08, 216. Miles directed law enforcement to cut Bowman out of the car to be certain that Bowman was deceased. *Id.* at 208. To gain access to Bowman, law enforcement officers had to remove the Mazda's roof, stabilize the tow truck because it was still sitting on top of the Mazda, and use a hydraulic ram to move the dashboard. *Id.* Once removed, Bowman's body was transported to an ambulance, where the paramedics were unable to detect any signs of life and determined that Bowman was deceased. *Id.* at 208, 216.

[6] Fliehman also suffered serious injuries in the accident and sustained a laceration from the top of her scalp to her neck, a severe concussion, a broken nose, an abrasion on her eye, and a broken left arm. *Tr. Vol. III* at 341. She developed nerve damage which resulted in the right side of her face being paralyzed, needed more than twenty staples as a result of the laceration to her scalp, and had to undergo surgery on her left arm. *Id.* As a result of her broken nose, Fliehman lost her sense of smell and will require surgery in the future to improve her ability to breathe. *Id.* at 342.

[7] Sergeant Benjamin Goodin of the Columbus Police Department ("Sergeant Goodin") was the second officer to arrive on scene, and after staying with Fliehman until she could receive medical attention, he noticed that Pedigo had not exited his tow truck. *Tr. Vol. II* at 230. Concerned that he may be injured, Sergeant Goodin asked Officer John Morphew ("Officer Morphew") to check

on Pedigo. *Id.* Officer Morphew approached the driver's side door of the tow truck and asked Pedigo if he had been injured. *Id.* at 163. Pedigo responded that he had some back pain but that he thought he was okay. *Id.* Officer Morphew asked Pedigo to exit the tow truck, and once he had exited, Pedigo told Officer Morphew that the accident occurred after he had "looked down and looked back up and saw the traffic in front of him had stopped." *Id.* at 164. Pedigo told the officer that he had "slammed on his brakes" but that the tow truck "didn't stop and skidded into the vehicles ahead of him." *Id.*

[8] Officer Morphew asked Pedigo if he had had anything to drink or had taken any medication, and Pedigo said he had not. *Id.* At that point, Officer Morphew asked Pedigo to submit to a horizontal gaze nystagmus test but did not ask him to perform a walk-and-turn test or one-leg stand due to his back pain. *Id.* at 166. Before administering the horizontal gaze nystagmus test, Officer Morphew described the test and explained its instructions to Pedigo, who indicated that he understood them. *Id.* at 168. Instead of following the instructions to follow the officer's finger with his eyes without moving his head, Pedigo merely stared straight ahead. *Id.* at 167-68. After Officer Morphew had repeated the instructions four or five times, Pedigo followed the instructions, and Officer Morphew did not observe any clues to indicate that Pedigo was intoxicated. *Id.* at 168.

[9] Officer Morphew asked each driver at the scene to submit to a portable breath test. *Id.* at 169. None of the drivers, including Pedigo, tested positive for the presence of alcohol. *Id.* However, after speaking with Sergeant Goodin,

Officer Morphew was instructed to ask Pedigo for his consent to submit to a chemical test, specifically, a blood draw. *Id.* Officer Morphew read Pedigo the Indiana Implied Consent law concerning fatal crashes and obtained Pedigo's consent to conduct a blood draw. *Id.* at 170-71. Officer Morphew then transported Pedigo to Columbus Regional Hospital to have the blood draw done. *Id.* at 171.

[10] At the hospital, Pedigo was asked to complete additional documentation to indicate that he consented to the blood draw, and Officer Morphew observed him sign the form and have his blood drawn. *Id.* at 173-74. Alexa Nemeth ("Nemeth"), a phlebotomist at Columbus Regional Hospital performed the blood draw on Pedigo. *Tr. Vol. III* at 289-90, 292. After consenting to the blood draw, Pedigo provided a second statement to Officer Morphew regarding how the crash occurred. *Tr. Vol. II* at 174-75. In that statement, Pedigo told Officer Morphew that he had just left the interstate and was heading eastbound on State Road 46 when he looked down at his GPS. *Id.* at 175. When he looked back up, a "dark colored car" suddenly changed lanes in front of him, which caused him to collide with that "dark colored car" and the remaining cars stopped at the light. *Id.*

[11] Because in his first statement Pedigo had stated that his tow truck had failed to stop despite him applying the brakes, Indiana State Trooper Seth Davidson inspected the tow truck for abnormalities and found no issues with the tow truck that would have contributed to the accident. *Id.* at 199-200, 202. Kelly Holley ("Holley"), a certified crash reconstructionist with the Columbus Police

Department, also conducted an investigation into the cause of the accident and concluded that the primary cause of the accident was Pedigo's unsafe speed. *Id*. at 246-47; *Tr. Vol. III* at 260. Holley concluded that Pedigo did not "operate or travel at a speed that was prudent to adjust to changing traffic" or to accommodate "the weather conditions at the time." *Tr. Vol. III* at 260. Holley requested a search warrant for the tow truck's electronic control module, commonly referred to as the "black box," and the information she obtained confirmed that Pedigo had not been operating the tow truck at a safe speed to avoid colliding with other vehicles in the roadway. *Id*. at 267.

[12] Pedigo's blood sample was sent to the Indiana State Department of Toxicology where it was analyzed. *Id*. at 296. The analysis revealed that Pedigo had THC-COH, an inactive metabolite of THC, in his blood, and further testing also revealed that he had amphetamine and methamphetamine at four times the therapeutic level in his blood at the time of the accident. *Id*. at 322, 325, 329-30.

[13] On May 17, 2018, the State charged Pedigo with Level 5 felony reckless homicide, Level 4 felony causing death when operating a motor vehicle with a schedule I or II controlled substance in the blood, and Level 6 felony causing serious bodily injury when operating a motor vehicle with a schedule I or II substance in the body. *Appellant's App. Vol. II* at 12-14. On November 13, 2018, Pedigo filed a motion to suppress, alleging that the results of his blood draw should be suppressed. *Id*. at 17. On November 20, 2019, a suppression hearing was held, and at the conclusion of the hearing, Pedigo argued that Indiana

Code section 9-30-7-3 prohibits an officer from offering a subsequent chemical test after receiving negative results from a previous portable breath test, unless the officer has probable cause to believe that the person is under the influence of a controlled substance or other drug. *Tr. Vol. II* at 36. The State argued that section 9-30-7-3 requires law enforcement officers to offer either a portable breath test or chemical test to each driver involved in a crash resulting in serious bodily injury or death, but that there is no requirement as to which test a law enforcement officer must offer first and subsection (b) establishes that an officer may offer more than one test to a person, so long as those tests are offered within three hours of the accident. *Id*. at 31-32. The State further contended that subsections (a)(1)-(3) merely state circumstances that require a law enforcement officer to offer a subsequent chemical test to a driver after administering a portable breath test. *Id*. at 32.

[14] On November 27, 2018, the trial court issued an order denying Pedigo's motion to suppress and stating that pursuant to a plain reading of Indiana Code section 9-30-7-3(a) and (b), "an officer may offer a portable breath test or chemical test, and may offer more than one of said tests, based solely on the occurrence of a fatal accident, not on the outward signs of intoxication or impairment exhibited by a vehicle operator." *Appellant's App. Vol. II* at 17. It also concluded that subsections (a)(1)-(3) "simply set[] forth additional conditions if the officer chooses to offer the driver a portable breath test first, but does not preclude the officer from offering a person another test pursuant to [subsection(b)]." *Id*.

[15] On May 14, 2019, a jury trial was held, during which Officer Morphew testified that he did not have probable cause to believe that Pedigo was under the influence at the time the officer asked him to submit to a subsequent chemical test. *Tr. Vol. II* at 185. Pedigo then renewed his motion to suppress the evidence related to his blood draw, which the trial court denied. *Id.* at 187, 190. Later in the trial, the State moved to admit Pedigo's toxicology report, and Pedigo objected to the admission of the report, arguing that the State had failed to lay a proper foundation for the admission of the evidence under Indiana Code section 9-30-6-6. *Id.* at 300-02. Pedigo argued that the State had failed to present evidence to show that Nemeth had followed a protocol prepared by a physician. *Id.* at 302. The trial court sustained the objection, and the State requested permission to recall Nemeth to present evidence relating to her hospital's protocol. *Id.* at 303-04. Pedigo objected to Nemeth being recalled, arguing that it was not appropriate to give the State a "second shot at it." *Id.* at 304. The trial court noted that neither party had requested that Nemeth be released from her subpoena and allowed the State a short period of time to recall Nemeth. *Id.*

[16] When she was recalled, Nemeth testified that, when she did the blood draw on Pedigo, she followed a protocol approved by a pathologist and that Columbus Regional Health is a licensed hospital. *Id.* at 306-07. She described each step that she takes when she collects a blood sample for law enforcement. *Id.* at 310. At the conclusion of Nemeth's testimony, Pedigo renewed his objection, and the State responded by arguing that the evidence was admissible because the

State had shown that Nemeth followed a protocol approved by a physician at a licensed hospital. *Id*. at 308, 317, 319. The trial court overruled Pedigo's objection and based its decision on the evidence that there was an established protocol for the blood draw, Columbus Regional Health was a licensed facility, and that Nemeth was certified in phlebotomy and that there had been no evidence presented to show that the reliability of the sample had been compromised. *Id*. at 320.

[17] At the conclusion of the trial, the jury found Pedigo guilty as charged. *Id*. at 377-78. On July 12, 2019, a sentencing hearing was held. *Tr. Vol. III* at 382. During the hearing, Pedigo testified that he had started attending Alcoholics Anonymous and Narcotics Anonymous two to three weeks after the accident. *Id*. at 390, 392. He admitted that he had been convicted of operating a vehicle while intoxicated in 1993 and 2005, and as a condition of those convictions, he had been ordered to complete an intensive outpatient program for his substance abuse issues, but he never completed that program. *Id*. at 392-93. Pedigo also acknowledged that he had not sought substance abuse treatment until after the accident and that he had used marijuana and methamphetamine up to one week before the trial. *Id*. at 393.

[18] At the conclusion of the evidence, the trial court found the following mitigating factors: Pedigo had a steady work history; he had a stable residence of twenty-three years; that incarceration would cause financial hardship to Pedigo's family; he had a limited criminal history; he had familial support; he was remorseful; and he had a low risk to reoffend. *Id*. at 407; *Appellant's App. Vol. II*

at 33. The trial court found the following aggravating factors: Pedigo's two prior convictions for operating a vehicle while intoxicated; his previous probation violations for positive drug screens; his failure to comply with treatment or seek treatment for his substance abuse addiction in the previous thirteen years; his continued use of marijuana and methamphetamine until one week prior to trial; Pedigo's lack of understanding regarding the seriousness of his substance abuse addiction and his culpability for the devastating consequences of his actions; Pedigo's choices which caused Fliehman serious bodily injury and trauma and also damage to many others; and the seriousness of Fliehman's injuries that were above those contemplated by the statute. *Tr. Vol. III* at 407-18; *Appellant's App. Vol. II* at 34.

[19] Finding that the aggravating factors outweighed the mitigating factors, the trial court imposed a four-year sentence for the reckless-homicide conviction, nine years for the Level 4 felony conviction, and two years for the Level 6 felony conviction for an aggregate sentence of 15 years. *Tr. Vol. III* at 419-20; *Appellant's App. Vol. II* at 33-35. The trial court ordered thirteen years to be executed in the Department of Correction and two years suspended to formal probation. *Tr. Vol. III* at 420; *Appellant's App. Vol. II* at 31-32, 34-35. Pedigo now appeals.

# Discussion and Decision

## I.  Authorization for Blood Draw

Pedigo argues that, under Indiana Code section 9-30-7-3, law enforcement was not permitted to offer him a chemical test after he had submitted to a portable breath test, which produced a negative result, when they did not have probable cause for intoxication.  Indiana Code chapter 9-30-7 addresses a driver's "implied consent in accidents involving serious injury or death."  Indiana Code section 9-30-7-3, the specific statute at issue here, provides:

> (a) A law enforcement officer shall offer a portable breath test or chemical test to any person who the officer has reason to believe operated a vehicle that was involved in a fatal accident or an accident involving serious bodily injury.  If
>
> (1) the results of a portable breath test indicate the presence of alcohol;
>
> (2) the results of a portable breath test do not indicate the presence of alcohol but the law enforcement officer has probable cause to believe the person is under the influence of a controlled substance or another drug; or
>
> (3) the person refuses to submit to a portable breath test;
>
> the law enforcement officer shall offer a chemical test to the person.
>
> (b) A law enforcement officer may offer a person more than one (1) portable breath test or chemical test under this section. However, all chemical tests must be administered within three (3)

hours after the fatal accident or the accident involving serious bodily injury.

Pedigo asserts that subsection 9-30-7-3(a)(2) "should be read to say that where a [portable breath test] result is negative but there is still probable cause for intoxication, police *shall* obtain a blood sample; however, where a [portable breath test] result is negative and there is no probable cause for intoxication, police *may not* seek a blood sample." *Appellant's Br*. at 14-15 (emphasis in original).

[21] Pedigo's argument on appeal raises a question of law, which we consider de novo. *Bridges v. State*, 109 N.E.3d 453, 455 (Ind. Ct. App. 2018). When interpreting a statute, we must first determine whether the statutory language is clear and unambiguous. *Trout v. State*, 28 N.E.3d 267, 271 (Ind. Ct. App. 2015). If it is, we will not apply any rules of construction other than to require that words and phrases be given their plain, ordinary, and usual meanings. *Taylor v. State*, 7 N.E.3d 362, 365 (Ind. Ct. App. 2014). However, if a statute is susceptible to multiple interpretations, it is deemed ambiguous and open to judicial construction. *Id.* "In interpreting the statute, 'we will attempt to determine and give effect to the intent of the legislature, and to that end, we read provisions of a statute together so that no part is rendered meaningless if it can be harmonized with the remainder of the statute.'" *Id.* (quoting *Dykstra v. City of Hammond,* 985 N.E.2d 1105, 1107 (Ind. Ct. App. 2013), *trans. denied*). We read the statute as a whole, avoiding excessive reliance on a strict, literal

meaning or the selective reading of individual words. *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012).

[22] Pedigo relies on *State v. Whitney*, 889 N.E.2d 823 (Ind. Ct. App. 2008) for his contention that where a portable breath test result is negative and there is no probable cause for intoxication, police may not seek a blood sample. While, he is correct that *Whitney* stated that, according to section 9-30-7-3, if, after an officer offers a portable breath test or chemical test to a driver of a vehicle involved in a crash involving serious bodily injury or death, "the [portable breath test] is negative, an officer cannot offer a chemical test unless the officer has 'probable cause to believe the person is under the influence[of a controlled substance or another drug],'" that is not the holding of the case. *Whitney*, 889 N.E.2d at 828 (quoting Ind. Code § 9-30-7-3(a)(2)). *Whitney* involved a motorcycle driver who was stopped for speeding and offered a portable breath test when the officer thought he smelled the odor of alcohol but did not yet have probable cause of intoxication. *Id*. at 825. The issue presented in the case was whether law enforcement officers need to have probable cause of intoxication before offering an initial portable breath test. Therefore, the case did not involve offering a portable breath test or a chemical test to a driver who had been involved in an accident involving serious bodily injury or death and did not involve the interpretation of section 9-30-7-3 as it related to giving a subsequent chemical test after receiving negative results from an initial portable breath test. Instead, the case merely cited to section 9-30-7-3 as an example of how the legislature treats portable breath tests and chemical tests as mutually

exclusive. The holding of *Whitney* is that law enforcement officers are not required to have probable cause of intoxication in order to offer an initial portable breath test, but they do need to have reasonable suspicion. *Id*. at 828-29. Because *Whitney* did not interpret section 9-30-7-3 as it relates to our case, the statement that probable cause is required to offer a chemical test when an initial portable breath test result is negative is dicta and not binding law. *See State v. Hardy*, 7 N.E.3d 396, 401 (Ind. Ct. App. 2014) (stating that dicta refers to statements that a court makes that are not necessary in the determination of the issues presented, are not binding, and do not become law, although it may be considered persuasive) (citing *Koske v. Townsend Engineering Co.,* 551 N.E.2d 437, 443 (Ind. 1990)).

[23]     Both parties also cite to *Mannix v State*, 54 N.E.3d 1002 (Ind. Ct. App. 2016) in their arguments, but such reliance is misplaced. *Mannix* did not make any determination as to whether subsection 9-30-7-3(a)(2) provides that when a portable breath test is initially given, the result is negative, and there is no probable cause for intoxication, that police are prohibited from offering a subsequent chemical test. In *Mannix*, a driver involved in a fatal accident was offered a chemical test first and not a portable breath test, but her chemical test was not administered until over three hours after the accident occurred. *Mannix*, 54 N.E.3d at 1005. Mannix argued first that her consent was not voluntary because she was not given a portable breath test first and relied on the conditions contained in subsection (a)(2). *Id*. at 1007-08. The court found that the first sentence of subsection (a) states that an officer "shall offer a portable

breath test *or* chemical test," and an officer can choose which test to offer a driver first and that the conditions in subsection (a) simply set forth additional conditions that apply if the officer chooses to offer the driver a portable breath test first. *Id*. at 1008 (quoting Ind. Code § 9-30-7-3(a)). Because a chemical test was offered first and not a portable breath test, the court found that the conditions set out in subsection 9-30-7-3(a) did not apply. *Id*. at 1008. The court went on to determine that consent given by Mannix was voluntary even when the chemical test was administered over three hours after the accident occurred and that the delay in time only deprived the State of the presumption under Indiana Code section 9-30-6-15 that the driver's blood-alcohol concentration at the time of the chemical test can relate back to the time of the accident. *Id*. at 1009. Therefore, neither *Whitney* nor *Mannix* is controlling, and this issue is one of first impression.

[24] In interpreting the statute, we note that section 9-30-7-3(a) clearly states that, when a law enforcement officer has reason to believe that a person operated a vehicle that was involved in a fatal accident or an accident involving serious bodily injury, the officer is required to offer a portable breath test or chemical test to the person. Reading the statute as a whole, it is clear that subsections (a)(1)-(3) set out three circumstances where a law enforcement officer *must* offer a subsequent chemical test when the officer opts to first offer a portable breath test. Ind. Code § 9-30-7-3(a)(1)-(a)(3). Nothing in these subsections *prohibits* a law enforcement officer from offering a subsequent chemical test when such circumstances are not present; the subsections merely provide when an officer *is*

*required* to give a subsequent chemical test. This is especially true when reading subsection (a) in conjunction with subsection (b). Subsection (b) expressly provides that "a law enforcement officer may offer a person more than one (1) portable breath test or chemical test under this section." Ind. Code § 9-30-7-3(b).

[25] When reading the statute in its entirety, the legislature clearly intended subsection (a)(2) to compel law enforcement officers not to conclude their investigation when they receive a negative portable breath test result and also have probable cause to believe that the driver is under the influence of something other than alcohol. *See* Ind. Code § 9-30-7-3(a)(2). In those circumstances, the legislature requires that an officer offer both the portable breath test and the chemical test. However, there is nothing in a plain reading of section 9-30-7-3 that prohibits an officer from offering more than one test following an accident resulting in serious bodily injury or death. In fact, subsection (b) explicitly allows an officer to offer more than one test. Ind. Code § 9-30-7-3(b).

[26] Further, under subsection (a), an officer is allowed to offer either a portable breath test or a chemical test initially. Ind. Code § 9-30-7-3(a). Under Pedigo's interpretation of the statute, subsection (b) would be rendered meaningless whenever an officer chooses to offer a preliminary portable breath test before asking the driver to submit to a chemical test because in those cases subsection (b) would no longer be applicable unless an officer develops probable cause. If the legislature had intended such a result, presumably, it would have added

such condition to the language of subsection (b). "It is a rule of statutory interpretation that 'courts will not presume the legislature intended to do a useless thing . . . .'" *State v. Brunner*, 947 N.E.2d 411, 416 (Ind. 2011) (quoting *N. Ind. Bank & Trust Co. v. State Bd. of Finance,* 457 N.E.2d 527, 532 (Ind.1983)). We do not believe that the legislature intended that subsection (b) be rendered meaningless.

[27] In his reply brief, Pedigo contends that subsection 9-30-7-3(b)'s provision that a "law enforcement officer may offer a person more than one (1) portable breath test or chemical test under this section" should be interpreted as referring to a situation where the first test that an officer administers has an inconclusive result, therefore allowing an officer to re-administer the test as many times as necessary to obtain a usable result. However, if that is what the legislature intended, it could have included language specifying that multiple tests can only be given when inconclusive results are obtained. The plain language of subsection (b) does not contain any such limitation, and we decline to hold that such a limitation exists.

[28] We, therefore, conclude that under Indiana Code section 9-30-7-3, a law enforcement officer is permitted to offer a subsequent chemical test to a person who the officer has reason to believe operated a vehicle that was involved in a fatal accident or an accident involving serious bodily injury when the officer has first administered a portable breath test that produces negative results even if the officer does not have probable cause to believe the person is under the influence of a controlled substance or another drug. Here, it is undisputed that

Pedigo was involved in an accident that involved serious bodily injury and resulted in a death, and the officer first administered a portable breath test that came back negative. However, even though the officer stated that he did not have probable cause to believe that Pedigo was under the influence of a controlled substance, under Indiana Code section 9-30-7-3, we conclude that the officer was authorized to offer Pedigo a subsequent chemical test, specifically a blood draw in this case.

## II. Admission of Blood Draw Results

[29] Pedigo contends that the trial court abused its discretion when it admitted his blood draw results into evidence at trial. A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb the court's rulings only where the petitioner has shown an abuse of that discretion. *Bowman v. State*, 51 N.E.3d 1174, 1180 (Ind. 2016). An abuse of discretion occurs only if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.* "In examining whether evidence was appropriately admitted, '[w]e consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant.'" *Id.* (quoting *Pierce v. State,* 29 N.E.3d 1258, 1264 (Ind. 2015)).

[30] Pedigo asserts it was an abuse of discretion to admit the results of his blood draw at trial because the State failed to lay a proper foundation for admitting them. Specifically, he argues that the State failed to present evidence that the

person who drew Pedigo's blood was acting under the direction of or under a protocol prepared by a physician as required by Indiana Code section 9-30-6-6.

[31] Indiana Code section 9-30-6-6(a) sets out the foundational requirements for the admission of chemical tests on blood. Pursuant to that statute, blood samples collected at the request of a law enforcement officer as part of a criminal investigation must be obtained by "[a] physician or a person trained in obtaining bodily substance samples and acting under the direction of or under a protocol prepared by a physician[.]" Ind. Code § 9-30-6-6(a). As our Supreme Court has recognized, "the foundation for admission of laboratory blood drawing and testing results, by statute, involves technical adherence to a physician's directions or to a protocol prepared by a physician." *Hopkins v. State,* 579 N.E.2d 1297, 1303 (Ind. 1991).

[32] Pedigo relies on *Combs v. State,* 895 N.E.2d 1252 (Ind. Ct. App. 2008), *trans. denied,* for his contention. There, Combs argued that "the State failed to lay a proper foundation for admitting" blood test results "because it did not present evidence that the person who drew Combs's blood acted under proper protocol." *Id*. at 1256. This court stated that because our Supreme Court had noted that "the foundation for admission of laboratory blood drawing and testing results, by statute, involves technical adherence to a physician's directions or to a protocol prepared by a physician," the foundational requirement of Indiana Code section 9-30-6-6 could "not be ignored." *Id.* (quoting *Hopkins,* 579 N.E.2d at 1303). In *Combs*, the medical technician who drew the blood testified "about her educational background and professional

experience drawing blood samples," and further testified regarding the procedure she utilized in drawing Combs's blood. *Id.* However, we found "that the State failed to present evidence that [this technician] was a 'physician or a person trained in obtaining bodily substance samples and acting under the direction of or under a protocol prepared by a physician[.]'" *Id.* at 1257 (quoting Ind. Code § 9-30-6-6(a)). Specifically, we found the "record devoid of evidence that a physician prepared the protocol followed by" the technician, and "absolutely no evidence that she acted under the direction of a physician" when drawing Combs's blood, and we held that "the State failed to lay a proper foundation for admitting the blood test results." *Id.* at 1258.

[33] We find the present case to be distinguishable from *Combs*, where there was no evidence presented that the medical technician collected Combs's blood using a protocol prepared by a physician. Here, the evidence most favorable to the ruling shows that Nemeth testified that she is certified in phlebotomy. *Tr. Vol. III* at 289-90. She further testified that she followed a protocol approved by a pathologist when drawing Pedigo's blood, and that Columbus Regional Health is a licensed hospital. *Id.* at 289, 291, 306-07. Nemeth also testified about each step that she takes when she collects a blood sample for law enforcement. *Id.* at 310. Specifically, she explained that she begins by providing the law enforcement officer the box containing the vials and watches the officer open the box, and she then hands the officer the paperwork that the patient is required to sign to indicate their consent. *Id.* She cleans the collection site with iodine, collects the blood sample, and labels the vials. *Id.* Finally, she watches

the officer place the blood samples and paperwork into the evidence box which is then sealed. *Id*.

[34] The evidence presented established that Nemeth was a person trained in obtaining bodily samples as required by Indiana Code section 9-30-6-6(a). The evidence further showed that Nemeth was "acting under the direction of or under a protocol prepared by a physician[.]" *See* Ind. Code § 9-30-6-6(a). We, therefore, conclude that the trial court did not abuse its discretion when it admitted Pedigo's blood draw results into evidence.

## III. Inappropriate Sentence

[35] Pedigo also asserts that his sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the [c]ourt finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Our Supreme Court has explained that the principal role of appellate review should be to attempt to leaven the outliers, "not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We independently examine the nature of Pedigo's offense and his character under Appellate Rule 7(B) with substantial deference to the trial court's sentence. *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015). "In conducting our review, we do not look to see whether the defendant's sentence is appropriate or if another sentence might be more appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Barker v. State*, 994 N.E.2d 306, 315

(Ind. Ct. App. 2013), *trans. denied*. Whether a sentence is inappropriate ultimately depends upon "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. Pedigo bears the burden of persuading us that his sentence is inappropriate. *Id*.[5]

[36] Here, Pedigo was convicted of Level 5 felony reckless homicide, Level 4 felony causing death when operating a motor vehicle with a schedule I or II controlled substance in the blood, and Level 6 felony causing serious bodily injury when operating a motor vehicle with a schedule I or II controlled substance in the body. A person who commits a Level 5 felony shall be imprisoned for a fixed term of between one and six years, with the advisory sentence being three years. Ind. Code § 35-50-2-6(b). A person who commits a Level 4 felony shall be imprisoned for a fixed term of between two and twelve years, with the advisory sentence being six years. Ind. Code § 35-50-2-5.5. A person who commits a Level 6 felony shall be imprisoned for a fixed term of between six months and two and one-half years, with the advisory sentence being one year. Ind. Code § 35-50-2-7(b), *trans. denied*. Therefore, the maximum sentence Pedigo could have received from the trial court was twenty and one-half years.

---

[5] Many of Pedigo's arguments seem to be contentions that the trial court considered improper aggravating factors or somehow abused its discretion in sentencing him. However, we note that Pedigo did not frame his argument in this way or provide any cogent argument regarding the trial court abusing its discretion and has not cited to any authority for such an argument. Therefore, to the extent that he is arguing that the trial court abused its discretion in finding aggravating and mitigating factors and in sentencing him, we conclude that he has waived any such argument. *Lee v. State*, 91 N.E.3d 978, 990-91 (Ind. Ct. App. 2017) (citing Ind. Appellate Rule 46(A)(8)(a)).

[37]  The trial court imposed a sentence of four years for Pedigo's Level 5 felony, nine years for his Level 4 felony conviction, and two years for his Level 6 felony conviction. The trial court ordered that those sentences be served consecutively for an aggregate fifteen-year sentence with thirteen years executed and two years suspended to probation. Pedigo's executed sentence was seven and one-half years less than the maximum he could have received, and his aggregate sentence was five and one-half years less than the maximum the trial court was authorized to impose.

[38]  As this court has recognized, the nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation. *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). The nature of the offense refers to a defendant's actions in comparison with the elements of the offense. *Cardwell*, 895 N.E.2d at 1224. "When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that 'makes it different from the typical offense accounted for by the legislature when it set the advisory sentence.'" *Moyer v. State*, 83 N.E.3d 136, 142 (Ind. Ct. App. 2017) (quoting *Holloway v. State*, 950 N.E.2d 803, 807 (Ind. Ct. App. 2011)), *trans. denied*.

[39]  In the present case, Pedigo recklessly drove his loaded tow truck on a public roadway, failing to "operate [it] or travel at a speed that was prudent to adjust to changing traffic" or to accommodate "the weather conditions at the time." *Tr. Vol. III* at 260. He did so with methamphetamine and amphetamine in his

system. His actions caused him to collide with Bowman's Mazda, which killed Bowman and caused Fliehman to suffer serious bodily injury. The investigation into the accident revealed that the primary cause of the accident was Pedigo's unsafe speed and that he was traveling at approximately thirty-seven miles per hour when he slammed into the back of the Mazda. *Id*. at 260, 268. When speaking with law enforcement, Pedigo gave differing stories in an attempt to excuse his reckless behavior. He first told Officer Morphew that he had "looked down and looked back up and saw the traffic in front of him had stopped" and that he had "slammed on his brakes," but the tow truck "didn't stop and skidded into the vehicles ahead of him." *Tr. Vol. II* at 164. Subsequent testing of the tow truck did not discover any issues with the truck that could have contributed to the accident. *Id*. at 202. Later the night of the accident, Pedigo told Officer Morphew a different story about how the accident occurred. He said he had just left the interstate and was heading eastbound on State Road 46 when he looked down at his GPS, and when he looked back up, a "dark colored car" suddenly changed lanes in front of him which caused him to collide with that "dark colored car" and the remaining cars stopped at the light. *Id*. at 175. However, this story was not "corroborated by any other witness." *Tr. Vol. III* at 411-12.

[40] As a result of the accident, Bowman was killed when the Mazda crushed in around him, and Fliehman sustained serious injuries with long-lasting effects. She suffered a laceration that extended from the top of her scalp to her neck, a severe concussion, a broken nose, an abrasion on her eye, and a broken left

arm. She developed nerve damage, which resulted in the right side of her face being paralyzed, received over twenty staples on her scalp, had to undergo reconstructive surgery on her left arm, lost her sense of smell, and will require surgery in the future to improve her ability to breathe. In addition to the damage done to Bowman and Fliehman, Pedigo's recklessness caused a chain reaction accident that involved numerous other victims, and six other drivers were all directly impacted by the accident. We do not find his sentence to be inappropriate in light of the nature of the offense.

[41] The character of the offender is found in what we learn of the offender's life and conduct. *Perry*, 78 N.E.3d at 13. When considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). The evidence showed that Pedigo had history of substance-abuse issues. He began to drink alcohol when he was eighteen years old and continued "throughout the years." *Tr. Vol. III* at 408. Pedigo stated he began using marijuana daily from the age of fifteen until he turned thirty years old and began using methamphetamine at the age of thirty for "stress relief." *Id*. at 408-09. Pedigo had two prior convictions for operating a motor vehicle while intoxicated and had violated the terms of his probation on two separate occasions by testing positive for methamphetamine. *Id*. at 407-08. As a part of his previous convictions, Pedigo was ordered to participate in intensive outpatient therapy and was given an opportunity to recognize "the seriousness of his substance use." *Id*. at 408. However, he failed to complete the treatment and did not take advantage of his past opportunities to address his

substance-abuse issues. Pedigo also admitted that he had not sought substance abuse treatment until after the accident and that he had continued to use marijuana and methamphetamine up to one week before the trial. *Id*. at 393. His continued substance abuse showed his "lack of understanding of the harmful and the devastating consequences" of that use and posed a danger to the community, particularly because of his employment as a tow truck driver, which caused him to travel on public roadways often hauling heavy automobiles. *Id*. at 409. We conclude that Pedigo's sentence is not inappropriate in light of his character.

[42] Pedigo has not shown that his sentence is inappropriate in light of the nature of the offense and the character of the offender. We, therefore, affirm the sentence imposed by the trial court.

[43] Affirmed.

Bailey, J., and Mathias, J., concur.