

I N T H E

# Court of Appeals of Indiana

George Lee Hall,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Feb 19 2025, 9:03 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

---

February 19, 2025

Court of Appeals Case No.
24A-CR-537

Appeal from the Benton Circuit Court

The Honorable John Wright, Judge

Trial Court Cause No.
04C01-2308-F2-283

---

**Opinion by Judge May**
Judges Brown and Pyle concur.

**May, Judge.**

[1] George Lee Hall appeals his convictions of Level 2 felony attempted burglary with a deadly weapon[1] and Class C misdemeanor operating a vehicle with a Schedule I or II controlled substance in his blood.[2] Hall raises four issues, which we revise and restate as:

1. Whether the trial court abused its discretion by admitting a toxicology report from a blood sample that was collected outside the three-hour window required by Indiana Code section 9-30-6-2;

2. Whether the trial court abused its discretion when it instructed the jury about the definition of a deadly weapon;

3. Whether the State presented sufficient evidence to convict Hall of attempted burglary with a deadly weapon; and

4. Whether Hall's sentence is inappropriate in light of the nature of his offense and his character.

We affirm.

## Facts and Procedural History

[2] In late July 2023, Hall, his long-term girlfriend Margaret Molencupp, and their friend Paul Farmer began discussing the possibility of robbing a property in a rural area of Benton County that contained a house, a large barn, and "a lot of

---

[1] Ind. Code §§ 35-43-2-1 (burglary) & 35-43-2-1(3)(A) (attempt).

[2] Ind. Code § 9-30-5-1(c).

abandoned cars and semi-trailers[.]" (Tr. Vol. 3 at 100.) People who work in the area refer to the property in question as "[t]he junk house" because there are forty or fifty cars around the house. (Tr. Vol. 2 at 176.) Hall and Molencupp drove by the junk house every day to conduct surveillance. They believed the house was vacant, and they devised a plan whereby they would enter the house during the day and remove items at night. In preparation, Hall gathered night vision goggles, a flashlight, bolt cutters, a pry bar, a black bag, and a machete and placed those items into a black backpack.

[3]     On the morning of August 2, 2023, Hall and Molencupp snorted methamphetamine and climbed into Hall's white Pontiac G6 with Hall's black backpack of tools. Molencupp slept in the backseat while Hall drove to pick up Farmer. Farmer brought a bag and a flashlight. Hall then drove the three of them to the vicinity of the junk house. Around 8:00 a.m., Hall drove his car into a corn field so that it could not be seen from the road. Hall used his machete to cut down stalks of corn that he put over the car to make it less visible. The three then separated with the expectation that they would rendezvous at the junk house, and they maintained contact with one another by messaging on cell phones.

[4]     Later that morning, a farm worker, Marty Lewis, was loading a sprayer to spray corn fields around the junk house. Lewis saw a man, later identified as Hall, who was wearing long black pants and a long-sleeve black shirt, exit a cornfield with a machete and black backpack, cross the road, and enter the cornfield on the north side of the road. As Lewis drove toward the field he was

to spray, he noticed a gap in the corn rows and, when he investigated, he saw Hall's car parked in the field. Lewis called his coworkers and asked them to come to the scene. Lewis's boss, Megan,[3] arrived and Lewis told her what he had seen. As they talked, Hall again crossed the road with his machete and backpack, and he re-entered the field on the south side of the road, so Lewis called 911 and requested that officers be dispatched to the area.

[5] Soon thereafter, Hall exited the field on the south side of the road and began to walk toward Lewis and Megan. En route to them, he "pitched" his backpack and machete into the corn field. (*Id.* at 184.) Then, a woman, later identified as Molencupp, exited the field on the north side of the road and walked to meet Hall. The two of them walked toward Lewis and Megan. Lewis walked down the road to meet them and ask what was happening. Hall claimed "he had a friend that had issues and took his car, and they were out hunting for him[.]" (*Id.* at 186.) Hall then turned to walk to his car. When Lewis followed him, Hall pulled a knife out of his pocket and turned toward Lewis. Lewis asked Hall to put the knife away and told Hall that police were already on the way. Hall put the knife away.

[6] When police arrived, Hall reported a friend "Paul Smith started going crazy[,]" got out of the car, and ran into the field. (*Id.* at 206.) Hall claimed he and Molencupp were looking for "Smith" in the field when they heard "Smith"

---

[3] We were unable to find a full legal name for "Megan" in the Record.

drive the car into the field. Hall also claimed the Pontiac G6 belonged to "Smith," but when Deputy Brayden Ely ran the plate, the report indicated the car was registered to Hall. Police recovered Hall's machete and black backpack, which contained headlamps, a cordless drill, bolt cutters, a pry bar, and rechargeable batteries. The machete had a green stain on it, which indicated it had been "used to cut down corn[.]" (*Id.* at 200.) Police found a camouflage ski mask on a nearby property, where tree branches had been recently broken when someone walked through an area that the property owner denied entering. Another farm worker found a second backpack in the field that contained flashlights, a hatchet, and gloves. Police inventoried Hall's Pontiac before impounding it and discovered night vision binoculars, regular binoculars, a walkie-talkie, a thirty-five-millimeter camera, socket sets, a propane torch, and assorted other tools.

[7] Benton County Sheriff John Cox also responded to the dispatch. He coordinated with the Newton County Sheriff's Office to use drones to search the fields for Hall's missing friend. When the drone operators could not find anyone in the field, Sheriff Cox began to suspect the story about "Smith" was false, and Sheriff Cox decided to detain both Hall and Molencupp until the investigation could be concluded. Sheriff Cox transported Hall to the county jail. Because Sheriff Cox believed Hall was under the influence of a controlled substance, he assigned Deputy Paden Clements, who was a certified drug recognition expert, to interview Hall at the jail.

[8]     When Deputy Clements interviewed Hall, Hall admitted he drove his car into the field and "said he did not use any drugs or alcohol since he had left the car[.]" (Tr. Vol. 3 at 54.) Hall provided a "[c]onfusing" story about why he and Molencupp were in the field that day. (*Id*. at 55.) As Deputy Clements conducted the interview, he was trying to determine whether Hall was impaired and, if so, whether the impairment was due to drugs or a medical condition. Hall displayed at least three indicators of impairment: rapid speech, incoherence of story, and paranoia. Deputy Clements applied for a search warrant to draw Hall's blood for a screening. A judge signed the search warrant at 5:44 p.m. on August 2, 2023. Deputy Clements drew Hall's blood at 6:06 p.m. and sent it to be tested for methamphetamine.

[9]     On August 3, 2023, the State charged Hall with Level 2 felony attempted burglary with a deadly weapon, Level 5 felony attempted burglary,[4] Class B misdemeanor possession of marijuana,[5] and Class C misdemeanor operating a vehicle with a Schedule I or II controlled substance or metabolite in the blood. Forensic testing determined Hall's blood contained methamphetamine. Forensic testing of cell phones belonging to Hall and Molencupp uncovered texts exchanged during the time when Hall, Molencupp, and Farmer were in the field in which Molencupp told Hall to "Abort" because "Some one is here[.]" (Ex. Vol. at 56.) Hall texted Molencupp to "[h]ead to road and dump

---

[4] Ind. Code § 35-43-2-1.

[5] Ind. Code § 35-48-4-11(a)(1).

disguise[.]" (*Id*. at 72.)  Molencupp texted Farmer: "And we need to take u to hospital so come out screaming or something[.]"  (*Id*. at 60) (errors in original).

[10]  Hall's trial began on December 19, 2023.  After the State's presentation of evidence, Hall moved for, and the trial court granted, a directed verdict on the count involving marijuana.  Hall proffered a jury instruction about the meaning of "deadly weapon" and the trial court refused to give that instruction.  A jury found Hall guilty of the three remaining charges.  The trial court entered convictions of Level 2 felony attempted burglary with a  deadly weapon and Class C misdemeanor operating a vehicle with a controlled substance in the blood.

[11]  Following preparation of a presentence investigation report, the court held a sentencing hearing at which neither party presented evidence.  The court found no mitigating circumstances and three aggravating circumstances: (1) Hall's criminal history, which includes murder, assault and battery with intent to kill, and "Failure to Stop for Blue Light" (App. Vol. 2 at 79); (2) Hall's commission of the instant crimes while on parole for murder; and (3) Hall's involvement of Molencupp in the crimes.  The court also noted Hall's risk of committing additional crimes is "Very High" according to the Indiana Risk Assessment Tool.  (*Id*. at 87.)  The court imposed concurrent sentences of twenty years for attempted burglary and sixty days for operating a vehicle with a controlled substance in the blood.

## Discussion and Decision

### 1. Admission of Evidence

[12] Hall argues the trial court abused its discretion by admitting the toxicology report that demonstrated Hall had methamphetamine in his blood. "'The admission or exclusion of evidence rests within the sound discretion of the trial court, and we review for an abuse of discretion.'" *Russell v. State*, 234 N.E.3d 829, 858 (Ind. 2024) (quoting *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012)), *cert. denied* --- S. Ct. ----, 2024 WL 4529860 (2024). Reversal is warranted "only if the trial court's ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *McCoy v. State*, 193 N.E.3d 387, 390 (Ind. 2022).

[13] Hall claims the chemical test was inadmissible because it was not conducted within the time frame required by Indiana Code section 9-30-6-2, which in necessary part states:

> (a) A law enforcement officer who has probable cause to believe that a person has committed an offense under this chapter, IC 9-30-5, or IC 9-30-9, or a violation under IC 9-30-15 shall offer the person the opportunity to submit to a chemical test.
>
> * * * * *
>
> (c) A test administered under this chapter must be administered within three (3) hours after the law enforcement officer had probable cause to believe the person committed . . . a violation under 9-30-15.

Although the State does not disagree with Hall's assertion that police failed to collect his blood sample within the three-hour window prescribed by Section 9-30-6-2, we cannot agree that failure renders the result of his test inadmissible.

[14] When a sample is collected within the three hours provided by Section 9-30-6-2, Indiana Code section 9-30-6-15 creates a presumption that the amount of alcohol in the person's blood at the time of the test represents the amount of alcohol in the person's blood when they operated the vehicle.[6] *See* Ind. Code § 9-30-6-15 ("the trier of fact shall presume…"). When a test is conducted more than three hours after driving, that impacts "the rebuttable presumption, not the admissibility of the chemical test." *Mannix v. State*, 54 N.E.3d 1002, 1009 (Ind. Ct. App. 2016) (quoting *State v. Stamm*, 616 N.E.2d 377, 380 (Ind. Ct. App. 1993)). Therefore, the test result was admissible despite being performed more than three hours after law enforcement first encountered Hall, *see Stamm*, 616 N.E.2d at 380 (holding results of blood test collected outside three-hour window were admissible), and the trial court did not abuse its discretion by admitting that evidence. *Cf. id.* (holding trial court abused its discretion by excluding the evidence).

---

[6] We acknowledge the presumption created by Section 9-30-6-15 is relevant only for charges involving impairment by alcohol – whereas Hall was alleged to have been impaired by methamphetamine – such that the presumption created by that statute is irrelevant for Hall's circumstances. Nevertheless, we reference the presumption as its existence is relevant to the caselaw's discussion of why the chemical test remains admissible when collected after the three-hour window.

## 2. Proposed Jury Instructions

Hall next argues the trial court abused its discretion by rejecting his proposed jury instruction on the definition of "deadly weapon." A trial court's provision of jury instructions is reviewed for an abuse of discretion. *Dunn v. State*, 230 N.E.3d 910, 914 (Ind. 2024). This review includes "'(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given.'" *Owen v. State*, 210 N.E.3d 256, 267 (Ind. 2023) (quoting *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000), *reh'g denied*), *reh'g denied*. "[E]rror in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case." *Knapp v. State*, 9 N.E.3d 1274, 1284-85 (Ind. 2014) (quoting *Whitney v. State*, 750 N.E.2d 342, 344 (Ind. 2001)), *cert. denied* 574 U.S. 1091 (2015). A trial court does not abuse its discretion if it denies a request for an instruction that would mislead or confuse the jury. *Owen*, 210 N.E.3d at 268.

[15] Our legislature provided the following definition of "deadly weapon":

> (1) A loaded or unloaded firearm

> (2) A destructive device, weapon, device, taser (as defined in IC 35-47-8-3) or electronic stun weapon (as defined in IC 35-47-8-1), equipment, chemical substance, or other material that in the manner it:

>> (A) is used;

(B) could ordinarily be used; or

(C) is intended to be used;

is readily capable of causing serious bodily injury.

(3) An animal (as defined in IC 35-46-3-3) that is:

(A) readily capable of causing serious bodily injury; and

(B) used in the commission or attempted commission of a crime.

(4) A biological disease, virus, or organism that is capable of causing serious bodily injury.

Ind. Code § 35-31.5-2-86(a). The legislature also defined "serious bodily injury": "bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." Ind. Code § 35-31.5-2-292.

[16] The trial court gave the jury the pattern jury instruction definition of "deadly weapon," which explains:

The term "deadly weapon" is defined by law as meaning: a weapon that in the manner it is used, or could ordinarily be used, is readily capable of causing serious bodily injury.

(App. Vol. 2 at 39) (paragraph formatting modified).  The trial court also gave the pattern jury instruction definition of serious bodily injury, which provides:

> The term "serious bodily injury" is defined by law as meaning bodily injury that creates: a substantial risk of death; or bodily injury that causes: serious permanent disfigurement, unconsciousness, extreme pain, permanent or protracted loss or impairment of the function of the bodily member or organ, or loss of a fetus.

(*Id.*) (paragraph formatting modified).

[17]  Hall acknowledges that the pattern jury instruction included the statutory definition of "deadly weapon" but, according to Hall, that definition, "without any context, [could] mislead the jury." (Appellant's Br. at 20.)  Hall proposed that the trial court instead give the following instruction:

> The question of whether a weapon is "deadly" is determined from a description of the weapon, the manner of its use, and the circumstances of the case.  Whether an object is a deadly weapon based on these factors is a question of fact.  The original purpose of the object is not considered.  Rather, the manner in which the defendant actually used the object is examined.  Also, it does not matter if actual injuries were sustained by the crime victim, provided the defendant had the apparent ability to injure the victim seriously through his use of the object during the crime.

(App. Vol. 2 at 48.)  The trial court declined to give Hall's instruction because the pattern jury instructions were sufficient.

[18]  Hall's proposed instruction came from *Gleason v. State*, 965 N.E.2d 702, 708 (Ind. Ct. App. 2012), where our court considered whether brass knuckles

qualified as a deadly weapon for a battery conviction. The other cases Hall cites - *Timm v. State*, 644 N.E.2d 1235 (Ind. 1994) (plastic flashlight), and *Burgh v. State*, 79 N.E.3d 955 (Ind. Ct. App. 2017) (paved parking lot) - similarly addressed whether specific objects could constitute deadly weapons. However, our Supreme Court has "long held" that language from appellate opinions, particularly from sufficiency-of-evidence cases, does not necessarily belong in jury instructions. *Batchelor v. State*, 119 N.E.3d 550, 563 (Ind. 2019). This principle is especially relevant here, because Hall's proposed instruction drew from cases analyzing evidence sufficiency rather than approving jury instructions. *Id*.

[19] Additionally, the cases Hall relies on involved everyday objects - a flashlight and parking lot surface - that had an obvious other "original purpose" completely divorced from damaging person or property. *Gleason*, 965 N.E.2d at 708. A machete, in contrast, is designed specifically to cut through biological matter, including humans.
*See* https://www.dictionary.com/browse/machete ("a large heavy knife used especially in Latin American countries in cutting sugarcane and clearing underbrush and as a weapon") [https://perma.cc/7PAG-LK7A]. Instructing a jury to ignore a machete's original purpose when deciding if it qualifies as a deadly weapon could cause confusion. The pattern instruction properly stated the law defining deadly weapons without risk of confusing the jury. Therefore, the trial court acted within its discretion in declining to give Hall's proposed instruction. *Cf. Batchelor*, 119 N.E.3d at 563 (trial court should have given only

the pattern jury instruction, rather than also giving instruction comprised of appellate language from a sufficiency-of-evidence case).

## 3. Sufficiency of Evidence

[20] Hall argues the State did not present sufficient evidence to support his conviction of Level 2 felony attempted burglary with a deadly weapon. When evaluating insufficient evidence claims, we must consider only evidence that supports the verdict and any reasonable inferences from that favorable evidence. *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020). Evaluating witness credibility and deciding the weight of the evidence is left to the fact-finder. *Teising v. State*, 226 N.E.3d 780, 783 (Ind. 2024). A conviction will be affirmed unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Fix v. State*, 186 N.E.3d 1134, 1138 (Ind. 2022) (quoting *Jackson v. State*, 50 N.E.3d 767, 770 (Ind. 2016)).

[21] "A person who breaks and enters the building or structure of another person, with intent to commit a felony or theft in it, commits burglary . . . a Level 2 felony if it: (A) is committed while armed with a deadly weapon[.]" Ind. Code § 35-43-2-1. "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime." Ind. Code § 35-41-5-1(a). Hall claims the State failed to present sufficient evidence that Hall's conduct constituted a substantial step toward the commission of burglary.

[22]     Whether Hall's conduct "'constituted a substantial step is a question of fact for the jury.'" *Saavedra v. State*, 186 N.E.3d 134, 141 (Ind. Ct. App. 2022) (quoting *Cowans v. State*, 412 N.E.2d 54, 55 (Ind. 1980)), *trans. denied*. While the defendant's act must go "beyond mere preparation," a substantial step can be minimal, "often defined as any 'overt act' in furtherance of the crime." *B.T.E. v. State*, 108 N.E.3d 322, 327 (Ind. 2018) (quoting *State v. Van Cleave*, 674 N.E.2d 1293, 1304 (Ind. 1996)). While there is no bright-line rule for what constitutes a substantial step, there are several factors that we can balance: "(1) whether the defendant's acts strongly corroborate his criminal intent; (2) the severity of the charged crime; (3) proximity to the underlying crime; (4) the examples listed in Model Penal Code section 5.01(2); and (5) whether the defendant's multiple acts, viewed together, indicate he attempted a crime." *Id.* at 328. Examples of conduct that suggest a substantial step in the Model Penal Code include: (a) lying in wait or searching for a victim; (b) enticing a victim to the scene of the planned crime; (c) conducting surveillance of the proposed crime location; (d) unlawful entry of premises; (e) possession of the materials for the crime without another lawful use; (f) possession of the materials for the crime near the location for commission of the crime; and (g) soliciting an innocent third party to perform an element of the crime. Model Penal Code § 5.01(2) (Am. Law Inst. 2018). The emphasis "is on what the defendant has already done toward committing the crime and not on what remains to be done." *Saavedra*, 186 N.E.3d at 141 (quoting *Zickefoose v. State*, 388 N.E.2d 507, 510 (Ind. 1979)).

[23] Relevant to the first factor from *BTE*, Hall argues "it is impossible to ascertain whether Hall had criminal intent" on the day in question. (Br. of Appellant at 15.) In support, he claims the "only evidence of criminal intent" came from the "self-serving testimony of" Molencupp. (*Id*.) Intent is a mental state "'and, absent an admission by the defendant, the trier of fact must resort to the reasonable inferences from both the direct and circumstantial evidence.'" *A.W. v. State*, 229 N.E.3d 1060, 1064 (Ind. 2024) (quoting *Stokes v. State*, 922 N.E.2d 758, 764 (Ind. Ct. App. 2010), *trans. denied*). We therefore infer whether a defendant had intent from his "conduct and the natural and usual sequence to which such conduct logically and reasonably points." *Id*. at 1065. In addition to Molencupp's testimony, the jury heard evidence that Hall was found in the vicinity of the junk house with a backpack full of tools commonly used to commit burglary. Hall provided no other plausible explanation for why he was carrying a backpack full of tools for committing burglary through Indiana corn fields while wearing long dark clothing on an August morning. Text messages between Hall, Molencupp, and Farmer during the time they were in the field also support an inference that the trio was there to accomplish a plan together that needed to be aborted because others were in the area and would discover them. Hall's argument regarding his intent fails.

[24] Hall also argues he cannot have taken a substantial step when "there is no evidence of any . . . forced entry, or that Hall even entered on to any properties housing a structure or dwelling on August 2, 2023." (Br. of Appellant at 15.) However, unlawful entry of a structure is only one of the examples of a

substantial step listed in the Model Penal Code, and Hall took many other steps toward his attempted crime. Hall, Molencupp, and Farmer met and devised a plan to rob the junk house. Hall and Molencupp drove past the junk house multiple days to conduct surveillance. *See* Model Penal Code § 5.01(2)(c) ("reconnoitering the place"). Hall collected a backpack of tools necessary to burglarize a house. *See id*. § 5.01(2)(e) (possession of materials for unlawful use). On the morning of August 2, 2024, Hall and Molencupp picked up Farmer and drove to the vicinity of the junk house. *See B.T.E.*, 108 N.E.3d at 329 (geographic proximity to intended crime). Hall pulled his car into a field of corn and cut down corn to camouflage his car. He took the backpack of tools and separated from his co-conspirators, to effectuate their plan of arriving separately at the junk house. *See* Model Penal Code § 5.01(2)(f) (possessing items for crime near proposed crime location). While the trio aborted their plan because farm workers were preparing to spray the fields where the car and co-conspirators were hidden, Hall's "conduct in the aggregate" – planning the burglary, arriving at the field, hiding the car, and taking the necessary tools toward the junk house – is more than sufficient to constitute a substantial step toward burglary. *See*, *e.g.*, *B.T.E.*, 108 N.E.3d at 334 (holding aggregate conduct amounted to a substantial step toward commission of aggravated battery). The evidence supports Hall's conviction of attempted burglary with a deadly weapon.

## 4. Inappropriate Sentence

Hall argues his sentence of twenty years is inappropriate. Under Indiana Appellate Rule 7(B), a sentence may be revised if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Sentencing is a function of the trial court, whose judgment "should receive 'considerable deference.'" *Oberhansley v. State*, 208 N.E.3d 1261, 1267 (Ind. 2023) (quoting *Cardwell v. State*, 895 N.E.3d 1219, 1222 (Ind. 2008)). This deference can only be "'overcome by compelling evidence portraying in a positive light the nature of the offense' and 'the defendant's character.'" *Lane v. State*, 232 N.E.3d 119, 122 (Ind. 2024) (quoting *Oberhansley*, 208 N.E.3d at 1267). Appellate review of a sentence is "to leaven outliers, . . . but not to achieve the perceived 'correct' result in each case." *Nicholson v. State*, 221 N.E.3d 680, 684 (Ind. Ct. App. 2023) (quoting *Cardwell*, 895 N.E.2d at 1225), *trans. denied*. The burden of proving a sentence is inappropriate falls to the defendant. *Littlefield v. State*, 215 N.E.3d 1081, 1089 (Ind. Ct. App. 2023), *trans. denied*.

Due to his significant criminal history and the fact that these events occurred while Hall was on parole for murder, Hall does not argue that his sentence is inappropriate based on his character. (Appellant's Br. at 22.) Instead, he argues only that a sentence of twenty years is inappropriate for his offense. The two prongs of Appellate Rule 7(B) are separate inquiries and revision of a sentence "may be warranted" when one prong weighs heavily in the appellant's favor. *Lane*, 232 N.E.3d at 126. "[T]o the extent the evidence on one prong

militates against relief, a claim based on the other prong must be all the stronger to justify relief." *Id*. at 127.

[27]  Turning to the nature of Hall's offense, we note the sentencing range for a Level 2 felony is ten to thirty years, with an advisory sentence of seventeen-and-one-half years. Ind. Code § 35-50-2-4.5. The trial court imposed a sentence of twenty years, which is slightly above the advisory but exactly mid-way between the minimum and maximum sentences. Hall argues his sentence is inappropriate based on the nature of the offense because his crime did not result in damage to any property. While neither burglary nor attempted burglary requires evidence of property damage, *see* Ind. Code § 35-43-2-1 (listing elements of crime), the lack of damage to property in this case is more likely due to the fact that Hall's plan was interrupted by the presence of others in the area. When discovered, Hall tried to dispose of incriminating evidence by throwing his backpack and machete into a nearby field, and he brandished a knife at a field worker. Hall created a false story about searching for a friend with a serious mental health condition, which caused both the Newton County Sherriff's Department and the Benton County Sheriff's Department to unnecessarily expend time and resources. Hall also had methamphetamine and amphetamine in his system during the attempted burglary. In short, Hall has not provided "compelling evidence" to support a sentence revision. *Lane*, 232 N.E.3d at 122. We therefore hold Hall's sentence is not inappropriate.

# Conclusion

[28] The trial court did not abuse its discretion by admitting the toxicology report into evidence. It similarly did not abuse its discretion by denying Hall's proposed jury instruction. The State presented sufficient evidence to support Hall's conviction of attempted burglary with a deadly weapon, and Hall's sentence of twenty years is not inappropriate. Accordingly, we affirm the judgment of the trial court.

[29] Affirmed.

Brown, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Jacob A. Ahler
The Law Office of Riley and Ahler, P.C.
Rensselaer, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Robert M. Yoke
Deputy Attorney General
Indianapolis, Indiana